136 F.3d 531
 Fed. Sec. L. Rep. P 90,141
Rebecca ISQUITH, by her custodian, Fred T. ISQUITH,
individually and on behalf of all others similarly
situated, Plaintiff-Appellant,
v.
CAREMARK INTERNATIONAL, INC., et al., Defendants-Appellees.
 No. 97-2026.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 4, 1997.
Decided Feb. 10, 1998.
 
 Terry Rose Saunders, Chicago, IL, Arthur T. Susman, Robert E. Williams, Charles R. Watkins (argued), Susman, Buehler & Watkins, Chicago, IL, for Plaintiff-Appellant.
 Dan K. Webb, Howard M. Pearl, Julie A. Bauer, Kevin D. Finger, Winston & Strawn, Chicago, IL, for Caremark International Incorporated.
 Tyrone c. Fahner, Vincent J. Connelly, Bennett W. Lasko (argued), Edward H. Williams, Mayer, Brown & Platt, Chicago, IL, for Baxter International Incorporated.
 Michael A. Pollard, William J. Linklater, Baker & McKenzie, Chicago, IL, for C.A. Lance Piccolo, James G. Connelly, III, Thomas W. Hodson.
 Before POSNER, Chief Judge, and CUMMINGS and MANION, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 This is a class action suit under Rule 10b-5 of the SEC and other antifraud provisions of federal securities law, with supplemental claims under state corporation law. The suit, against Baxter International (the pharmaceutical manufacturer) and a spun-off former wholly owned subsidiary of Baxter called Caremark, charges that Baxter submitted a fraudulent statement to the Securities and Exchange Commission in connection with the spinoff. The district judge granted a motion to dismiss, holding that there was no purchase or sale of securities; relinquished jurisdiction over the supplemental claims, pursuant to 28 U.S.C. § 1367(c)(3); and so dismissed the entire case.
 
 
 2
 The complaint alleges that in 1991, when Caremark was still part of Baxter, the government began investigating Caremark for suspected Medicare and Medicaid fraud. While publicly denying any wrongdoing, Baxter feared the worst. Why is unclear, since a parent ordinarily is not liable for its subsidiary's torts; and if it is, a spinoff will not insulate it. We need not unravel these mysteries; all that is important is that, according to the complaint (the only source of factual allegations in the case), Baxter decided to try to insulate itself from any potential liability by spinning off Caremark, that is, by transferring the ownership of the subsidiary from Baxter to Baxter's shareholders, each to receive shares of Caremark proportional to their shares in Baxter, with the result that Caremark would no longer be a subsidiary of Baxter but an independent company. In order to be assured of not having to register the new security created to effectuate the spinoff--for the shares of Caremark, as of Baxter, were to be publicly traded--Baxter wanted a "no action" letter from the SEC. The Commission issued the letter upon Baxter's agreeing to file an "information statement," see 17 C.F.R. § 240.14c-2, that would among other things disclose the purpose of the spinoff. The statement said that the purpose of the spinoff was to avoid a looming competitive conflict between Caremark and other lines of Baxter's business. That, according to the complaint, was a lie; the purpose of the spinoff was to minimize the liability of Baxter's shareholders for Caremark's fraud. But the SEC issued the requested "no action" letter; the spinoff--which did not require the consent of the shareholders--went through; and Baxter shareholders found themselves holding Baxter plus Caremark shares (one of the latter for every four of the former) rather than just Baxter shares.
 
 
 3
 The immediate effect of the transaction was to reduce the market value of Baxter stock because the spinoff had diminished Baxter's assets. But the market value of Baxter and Caremark stock--the only thing investors would care about--exceeded the value of Baxter stock before the spinoff. Eventually, however, the investing public got wind of Caremark's troubles, and the market value of its shares headed south. In 1995 Caremark pleaded guilty to criminal charges of fraud based on conduct going back to 1986 and paid the government $160 million.
 
 
 4
 The plaintiff class consists of the owners of Baxter shares at the time of the spinoff. The claim is that the spinoff constituted a forced "sale" of Caremark shares to them and that the sale was effected by fraud because, had the true purpose of the spinoff been revealed, owners of Baxter shares could have gotten the courts to block it; Baxter would then have been kept intact and Baxter stock would, they claim, today be worth more than the current combined value of Baxter and Caremark stock. It is difficult to see why, since Baxter's Caremark subsidiary, as it would have remained, would still have had to pony up the $160 million to the government. But the plaintiff argues, and in the posture of the case we must, though skeptical, accept, that the spinoff destroyed valuable synergies between Baxter and its Caremark subsidiary. If, however, whether on this or some other basis, the plaintiff could have gotten the spinoff enjoined, this implies that she can still sue for damages--as she has done, in the supplemental state law claim now pending in state court. So it is very difficult to see how Baxter's coyness about the purpose of the suit hurt her or the other members of the class. She says she may have a statute of limitations problem with her state law claim. But if that problem is due to Baxter's fraud in concealing Caremark's troubles, she can set up that fraud as a defense to the statute of limitations--the defense of fraudulent concealment. See, e.g., Cada v. Baxter Healthcare Corp., 920 F.2d 446, 451 (7th Cir.1990).
 
 
 5
 The plaintiff hints that the SEC, too, would have blocked, or at least delayed, the spinoff had it learned of Caremark's illegalities. Yet she points to nothing in the laws administered by the SEC that would have authorized the Commission to impede the transaction had Baxter confessed that its motivation was to lighten its liabilities. That is not an improper motivation, and anyway the Commission's concern is with the completeness and accuracy of information provided to investors rather than with what the information reveals about the soundness or even morality of the investment. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-78, 97 S.Ct. 1292, 1302-04, 51 L.Ed.2d 480 (1977); 1 Louis Loss & Joel Seligman, Securities Regulation 391 (3d ed.1989). So if Baxter had come clean, the SEC would still have had no grounds for refusing to issue a no-action letter. And, at worst, Baxter would then have registered the Caremark stock.
 
 
 6
 There is a lot more that is wrong with this suit. Suppose Baxter had been candid with the SEC--and hence the public, because both the information statement and the no-action letter were public documents, and the statement, at least, was mailed to the shareholders--about Caremark's liability. Then the market value of Baxter's shares would have fallen immediately, discounting any anticipated losses resulting from that liability, and the plaintiff class would have taken its hit then--before they could do anything about it--rather than later. Although investors who bought stock in Baxter or Caremark after the spinoff and in reliance on the stated purpose might have been hurt by Baxter's lack of candor, they are not members of the class. They have their own suit. The class in the present suit is limited to owners of Baxter shares at the time of the spinoff. If we assume with the plaintiff that Baxter would have been liable for its subsidiary's fraud, the spinoff shifted that liability to Caremark. Without the spinoff, it would have remained with Baxter. Since the members of the class owned both companies, the spinoff merely shifted liability from one pocket of their trousers to another. As for the loss of synergy, that has nothing to do with fraud. It is not a loss resulting from a misrepresentation or a misleading omission; it is a compounding of the poor business judgment that resulted in Caremark's getting into trouble with the government. The federal securities laws are not a remedy for poor business judgment. Searls v. Glasser, 64 F.3d 1061, 1069 (7th Cir.1995); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990); Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995).
 
 
 7
 The biggest problem with the suit is not the difficulty we're having figuring out how the members of the class could have been hurt by the alleged fraud in concealing the true purpose of the spinoff; for it is too early in the litigation to decide that this puzzle cannot be solved. Rather, it is the absence of other elements of federal securities fraud, such as that there have been a sale (or purchase--but for every purchase there is a sale). Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); Davidson v. Belcor, Inc., 933 F.2d 603, 605-06 (7th Cir.1991); Cohen v. Stratosphere Corp., 115 F.3d 695, 700-02 (9th Cir.1997). The members of the class did not buy or sell shares in Baxter. They did not buy or sell shares in Caremark. They simply received one share of Caremark stock for every four shares they owned of Baxter. They no more "bought" Caremark stock than the recipient of a stock dividend--which the plaintiff concedes the distribution of the Caremark stock was--buys the stock that he receives as a dividend. See Rathborne v. Rathborne, 683 F.2d 914 (5th Cir.1982); cf. Gelles v. TDA Industries, Inc., 44 F.3d 102 (2d Cir.1994).
 
 
 8
 Words are protean in the hands of lawyers, so it can be argued that the Baxter shareholders were forced in effect to "buy" Caremark shares, "paying" for them by the reduction in the value of their Baxter shares as a result of the diminution in Baxter's assets that was brought about by the spinoff. But to accept this argument we would have to have a reason for wanting to play with words in this way, and we cannot think of any that advances the purposes of the securities laws. Those laws create a remedy, so far as bears on this case, for someone who is induced by ("relied on," the courts usually say) a misrepresentation or a misleading omission to buy or sell a stock. O'Brien v. Continental Illinois National Bank & Trust Co., 593 F.2d 54, 60 (7th Cir.1979); In re NationsMart Corp. Securities Litigation, 130 F.3d 309, 321 (8th Cir.1997); Rubinstein v. Collins, 20 F.3d 160, 166 (5th Cir.1994). This presupposes that the someone had a choice, a choice distorted by the fraud. The members of the class in this case had no choice. They made no investment decision. They therefore cannot have been induced by the alleged fraud to buy or sell any securities even if the spinoff can somehow be thought of as effecting a sale of their shares in Baxter.
 
 
 9
 "The members of the class in this case had no choice ..." No investment choice, that is. They could have sued to try to stop the spinoff. Goldberg v. Meridor, 567 F.2d 209, 218-21 (2d Cir.1977) (Friendly, J.), holds that this option is enough to establish the materiality of a misleading statement to investors. See also Field v. Trump, 850 F.2d 938, 946-48 (2d Cir.1988). But we rejected the doctrine of the Goldberg case in LHLC Corp. v. Cluett, Peabody & Co., 842 F.2d 928, 931-32 (7th Cir.1988), and Harris Trust & Savings Bank v. Ellis, 810 F.2d 700, 704 (7th Cir.1987); it is not good law in this circuit. Goldberg would allow every complaint about the mismanagement of a corporation that issues securities subject to federal securities law to be shoehorned into federal court on the theory that management had defrauded the shareholders by concealing the mismanagement. This would carry the securities laws far outside their intended domain. And it would violate the principle that the only loss of which complaint is possible under the antifraud provisions of those laws is a loss that candor would have averted. Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648-49 (7th Cir.1997); Bastian v. Petren Resources Corp., 892 F.2d 680 (7th Cir.1990); Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447-49 (11th Cir.1997). Candor would not have averted the consequences of whatever mismanagement or misfortune resulted in Caremark's scrape with the federal government. Even a successful suit to block the spinoff would not have eliminated the liability to the government that is the ultimate cause of the harm for which the plaintiff seeks redress, and anyway so far as appears the plaintiff can still bring such a suit, albeit now for damages rather than for injunctive relief. Even if she cannot, and even if, had it not been for the alleged fraud, the plaintiff would have succeeded in getting the spinoff enjoined, the cases that we have just cited show that she cannot maintain this suit, because the fraud did not cause the loss of investment value of which she complains--the scrape over Medicare and Medicaid did that.
 
 
 10
 This is a bit overstated; that scrape was the major cause of the loss in value, but there are also those synergies allegedly lost because the spinoff was not enjoined. If we assume that a damages suit is somehow blocked, or that the value of those lost synergies could somehow not be quantified (in which event the damages remedy would be inadequate)--and if we ignore the fact that if this is so, the plaintiff cannot obtain damages, the only relief sought, in the present suit either--then it would be the case that the fraud in the information statement filed with the SEC had caused a loss to the plaintiff. But as the cases we have cited (Bastian and the others) make clear, it would not be a loss on which a suit under the antifraud provisions of the securities laws can be based. For it would not be a loss of the kind that these laws are concerned with, namely a loss of investment value as a consequence of the concealment or distortion of the truth. In the lingo of securities law, the plaintiff would have shown "transaction causation" (the transaction, here the spinoff and resulting change in the form of the plaintiff's holdings, would not have occurred but for the fraud) but not "loss causation" (a loss produced by a discrepancy between the actual market value of a stock and what that value would have been had there been no misrepresentation). Had Baxter claimed that the spinoff would not sacrifice any synergies between Caremark and Baxter's remaining units, and the claim was a deliberate falsehood, the resulting drop in the value of Baxter's or Caremark's stock when the truth emerged would be a proper basis for suit. No such false claim is alleged. Not a lie about synergies, but a corporate reorganization, caused the loss of investment value consequent upon their destruction.
 
 
 11
 The plaintiff directs us to another esoteric and dubious judge-made doctrine, called the "fundamental change" doctrine. 8 Loss & Seligman, supra, at 3707-11. It began life as the "forced seller" doctrine of Vine v. Beneficial Finance Co., 374 F.2d 627, 634-35 (2d Cir.1967). Vine, a minority shareholder squeezed out by the majority, was allowed to characterize the transaction as a sale. Which in a sense it was, as he was forced to exchange stock for cash; that is what a squeeze-out does. But precisely because it was a forced sale, the plaintiff had not been induced to make it by a misrepresentation or misleading omission. There was no inducing; there was compulsion. And exactly the same thing is true here. The members of the class were not given a choice about whether to receive Caremark shares.
 
 
 12
 The doctrine of the Vine decision was limited in Rathborne v. Rathborne, supra. That case involved a spinoff, just like the present one, and the court held that the spinoff was not a sale of securities, since it did not effect a "fundamental change" in the plaintiff's holding. To the same effect, see Gelles v. TDA Industries, Inc., supra, 44 F.3d at 104-05. When Vine is read in light of these and other cases, such as Sargent v. Genesco, Inc., 492 F.2d 750, 764-65 (5th Cir.1974), and also in light of the Supreme Court's decision in Blue Chip Stamps, which made clear that the relevant provisions of the securities laws are limited to purchases and sales, the "forced seller" doctrine is seen to be limited to situations in which the nature of the investor's holding is so far altered as to allow the alteration to be characterized as a sale, as in the exchange of stock for cash in Vine itself. A change in form will not count as a sale and so will not be actionable; the change must be in some sense "fundamental" rather than nominal; hence the renaming of the doctrine. See 8 Loss & Seligman, supra, at 3710-11. The distinction is critical in this case. In a squeeze-out, stock is exchanged for cash; the person squeezed out no longer has any interest in the corporation; that is unquestionably a change in his bundle of property rights. In a spinoff there is no exchange, no forced exit from the corporation, but merely the receipt by the corporation's shareholders of additional stock. Only the form in which the members of the class owned Baxter's assets was changed; it was changed from stock in one corporation to stock in two corporations. After the change the class members owned the same proportion, carrying the same rights, of the same pool of assets. Before, their ownership interest was denominated in shares of Baxter; after, in shares of Baxter and Caremark; the interest itself--the amount of assets owned by the members of the class--was unchanged.
 
 
 13
 So the fundamental-change doctrine, successor to the defunct forced-seller doctrine, is inapplicable to this case. And anyway we very much doubt that the doctrine retains any validity in any class of case, even in squeeze-out cases. In Santa Fe Industries, Inc. v. Green, supra, 430 U.S. at 473-77, 97 S.Ct. at 1300-03, decided after Vine, the Supreme Court made clear for the first time that securities fraud does not include the oppression of minority shareholders, which is what the plaintiff in Vine was complaining about. No more does securities fraud include unsound or oppressive corporate reorganizations, which is the essential complaint of the plaintiff class in this case. The fraud in concealing the purpose of the spinoff is merely the lever by which the class hopes to force into federal court a lawsuit over the wisdom of the spinoff. No doubt there should be legal remedies against fundamental changes in a corporation's structure that are undertaken in bad faith and hurt the shareholders; in fact there are; but a suit for securities fraud is not one of them. The office of securities fraud is to protect investors from being induced to make unsound sales or purchases by misrepresentations or misleading omissions.
 
 
 14
 This is implicit in the requirement that the plaintiff, to maintain his suit, have relied on the fraud, e.g., Basic Inc. v. Levinson, 485 U.S. 224, 243, 108 S.Ct. 978, 989-90, 99 L.Ed.2d 194 (1988), meaning that he changed his position because of it. It is implicit in the decisions that hold that there can be no suit under the securities laws by someone who has not made an investment decision, that is, who has not made a choice, a voluntary decision albeit one induced by the fraud, to buy or sell securities. Davidson v. Belcor, Inc., supra, 933 F.2d at 608; Norris v. Wirtz, 719 F.2d 256, 259-60 (7th Cir.1983); O'Brien v. Continental Illinois National Bank & Trust Co., supra, 593 F.2d at 59-60. There was no investment decision in Vine. Our plaintiff relies on SEC v. Datronics Engineers, Inc., 490 F.2d 250 (4th Cir.1973), but that case is inapposite because while the SEC indeed obtained an injunction against spinoffs, their only purpose had been to evade the registration requirements of the securities laws. There is no claim here that the failure to register the Caremark shares violated any such requirement.
 
 
 15
 It is true that Vine, like this case, had a fraud "handle," and that might seem to take it out from under the rule of the Santa Fe case. The plaintiff claimed that the defendant had by means of fraud obtained the shares of enough other shareholders to be in a position to squeeze him out, to his injury. But that injury strikes us as too remote from the fraud to be actionable in a suit under the securities laws. It is one thing to say, as the Supreme Court did in Basic Inc. v. Levinson, supra, in adopting the "fraud on the market" theory of liability under the securities laws, that a misrepresentation directed at a group of investors may become impounded in the price of the stock (when members of the group buy or sell under the inducement of the misrepresentation) and so may induce a purchase or sale by other investors. The misrepresentation induces action by those other investors, albeit indirectly. The misrepresentations in Vine were not directed at Vine and did not induce him to do anything; it made him vulnerable to a completely different kind of fraud--the abuse of minority shareholders by means of squeeze-outs, a form of fraud that the federal securities laws do not reach. And similarly in this case, the fraud by which Baxter allegedly obtained swift approval of the spinoff did not induce the members of the plaintiff class to buy or sell Baxter shares. It just made them vulnerable to what was neither a misrepresentation nor a purchase or sale of securities, but merely an involuntary change in the form of their holdings. Our O'Brien case featured the same fraud handle, see O'Brien v. Continental Illinois National Bank & Trust Co., supra, 593 F.2d at 60, yet we held that there was no purchase or sale of securities. We adhere to that decision, and note its inconsistency with the fundamental-change doctrine. But even if, as we greatly doubt, the doctrine is good law, it is, as we have explained, inapplicable to this case. To recapitulate: there was no forced sale, because only the form of the plaintiff's investment was changed; and anyway there was no reliance, no investment decision, because the plaintiff did not have a choice whether or not to accept the new stock.
 
 
 16
 AFFIRMED.