## SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,

v.

## Steven R. JAKUBOWSKI, Defendant–Appellant.

No. 97–4010.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1998.

Decided July 16, 1998.

---

Susan S. McDonald (argued), Catherine A. Broderick, Securities & Exchange Commission, Office of the General Counsel, Washington, DC, for Plaintiff–Appellee.

Christopher J. Barber (argued), Rudnick & Wolfe, Chicago, IL, for Defendant–Appellant.

Before CUDAHY, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

Steven Jakubowski, a bankruptcy lawyer at Skadden Arps Slate Meagher & Flom, decided to make some money on the side by lining up stock from savings associations that were abandoning the mutual form. From this endeavor he reaped only $51,500, substantially less than his income from practicing law. The risk-return ratio was unfavorable. These dealings led to his discharge from the law firm, his suspension from the practice of law for 18 months, and a judgment (in this case) that he committed securities fraud. The district court enjoined Jakubowski from further securities offenses and ordered him to pay double his profits from the scheme, plus prejudgment interest. 912 F.Supp. 1073 (1996), 1997 U.S. Dist. Lexis 4000, 1997 U.S. Dist. Lexis 14575.

When a financial intermediary such as a savings and loan association is organized as a

mutual, the depositors nominally own its net worth. Because a mutual lacks formal equity and can issue only debt, it may encounter trouble raising money—and federal bank regulators want financial institutions to generate capital in order to reduce the risk born by the deposit insurance funds. Because financial institutions owned in stock form tend to take additional risk (widespread owners can diversify better), see Lawrence R. Cordell, Gregor D. McDonald & Mark E. Wohar, *Corporate Ownership and the Thrift Crisis*, 36 J.L. & Econ. 719 (1993), regulators seek to ensure that conversion from mutual to stock form is accompanied by the injection of substantial new money. But the managers of mutual S&Ls have the opposite incentive. By issuing stock at a low price, they can appropriate much of the S&L's net worth for themselves. Suppose a S&L with $200 million in assets has a net worth of $10 million. The managers could take the firm public by issuing one million shares at $10 per share. After the sale the firm would have a net worth of $20 million, and with one million shares in circulation each would trade for $20. The "original issue discount" of $10 per share would accrue to the initial buyers, among whom managers could figure prominently. Seeking to give managers an incentive to take their S&Ls public at higher prices (and thus lower original issue discounts), and to share any remaining discounts with the depositors, the Office of Thrift Supervision promulgated 12 C.F.R. § 563b.3, which among other things limits managers' ability to invest when a mutual converts to stock form and gives each account holder a right to purchase some of the stock. For descriptions of this regulation and its background, see *Ordower v. OTS*, 999 F.2d 1183 (7th Cir.1993), and *Charter Federal Savings & Loan Association v. OTS*, 912 F.2d 1569, 1570–76 (11th Cir.1990). To prevent managers and their friends from buying the account holders' subscription rights for a pittance, § 563b.3(i) makes the rights nontransferable. (Account holders might sell for too little because they would not appreciate the bargain element built into the original issue discount. Because conversion marks the initial public offering of stock, the account holders lack the protection of an estab-

lished market price. Documents prepared in connection with an initial offering take a pessimistic view of the offering's prospects in order to curtail liability under the Securities Act of 1933, and unsophisticated offerees therefore may not appreciate the bargain being offered. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), provides an example.) The regulation provides:

> Acquisition of the securities of converting and converted savings associations—
>
> (1) Prior to the completion of a conversion, no person shall transfer, or enter into any agreement or understanding to transfer, the legal or beneficial ownership of conversion subscription rights, or the underlying securities to the account of another.
>
> (2) Prior to the completion of a conversion, no person shall make any offer, or any announcement of an offer, for any security of the converting savings association issued in connection with the conversion nor shall any person knowingly acquire securities of the converted savings association issued in connection with the conversion in excess of the maximum purchase limitations established in the association's approved plan of conversion pursuant to paragraph (c)(7) or (d)(4) of this section.

Like many a regulation, this one relies on broad application to thwart evasion. As written, § 563b.3(i) goes beyond arrangements between managers and depositors and forbids any third-party acquisition of depositors' subscription rights and executory contracts to purchase subscribers' shares when issued. This makes it hard for managers to acquire stock through nominees, at the expense of reducing market opportunities for the depositors. It is this regulation that Jakubowski set out to evade.

In May 1991 Jakubowski received a call from Frank E. Hart, president of Generation Capital Associates, a venture capital firm. Hart told Jakubowski that Cragin Federal Bank for Savings was converting from mutual to stock form and asked Jakubowski to find a depositor eligible to purchase its stock, which Hart estimated carried an original is-

sue discount of $3 per share. Hart offered to supply the capital necessary to buy as much stock as Jakubowski could find, paying Jakubowski 3.5% of any profit as a commission—but Hart's profit depended on lining up the stock *before* it was issued, for afterward the initial buyers then could sell to the market (reaping the original issue discount) rather than to Hart. Jakubowski was authorized to offer a 10% cut of Hart's profit to depositors eligible to purchase the stock, with Hart to bear all risk of loss. Jakubowski found a secretary at his law firm eligible to purchase stock in the Cragin offering, and she agreed to let Jakubowski use her subscription rights in exchange for 6.75% of the profits (increasing Jakubowski's take from 3.5% to 6.75%). The secretary gave Jakubowski an order form, which he filled out in her name with a request for 35,000 shares. The form instructed Cragin to send the shares to Jakubowski at Skadden Arps, as if he were the secretary's lawyer or trustee. Hart supplied the money. Jakubowski had the secretary sign the stock subscription form plus two documents that Cragin never saw—a stock power assigning ownership of the stock to Generation Capital Associates; and a contract awarding 6.75% of any eventual profit to the secretary. Cragin issued the stock as requested for $10 per share; trading after the conversion opened at $13.50 per share, and Hart sold the 35,000 shares at an average price of $14 per share. Generation Capital Associates paid $10,073 to each of Jakubowski and the secretary. Jakubowski engaged in several similar transactions over the next year, taking the initiative to espy converting S&Ls and receiving a larger cut of the profits as a reward. The last came in March 1992, when Calumet Federal Savings and Loan Association converted. One of the Calumet depositors Jakubowski located was the sister of Lynn McGovern, a lawyer in Skadden Arps' banking group. When McGovern learned that Jakubowski was trying to persuade her sister to let him use her subscription rights, McGovern reminded Jakubowski that an order could be placed only for the account of the depositor. At approximately the same time an officer of one converting S&L visited a depositor with whom Jakubowski was dealing and warned the depositor that he could not sell his subscription rights; the depositor relayed this warning to Jakubowski—whose response to McGovern's advice and the officer's warning was to create documents purporting to show that the account holders were buying the stock themselves with borrowed money.

The form Jakubowski submitted to Cragin in the secretary's name provided, directly above the signature line:

> All rights exercisable hereunder are not transferable and shares purchased upon exercise of such rights must be purchased for the account of the person exercising such rights.

The prospectus for the offering contained a similar but much longer restriction. All of the stock-purchase forms Jakubowski completed during the year he worked with Hart had functionally identical language; 10 of the 12 added that the depositors could not make agreements to sell the shares either. By filling out the form and procuring the secretary's signature, and adding his own name as the person to whom the stock should be sent, Jakubowski represented that this statement was true. But it was not. The stock was being purchased for the account of Generation Capital Associates, not of the secretary. Whether this transaction is best characterized as a transfer of the secretary's subscription rights, and thus a violation of § 563b.3(i)(1), as a pre-issuance offer to buy the secretary's stock, in violation of § 563b.3(i)(2), as both, or even (as Jakubowski insists) as neither, does not matter, for the OTS is not the plaintiff and § 563b.3 is not the fulcrum of the suit. The plaintiff is the Securities and Exchange Commission, and the regulation Jakubowski violated is 17 C.F.R. § 240.10b–5, the ubiquitous Rule 10b–5. Section 563b.3(i) is why the savings associations required purchasers to certify that they had not transferred their subscription rights or agreed to transfer the shares themselves. Rule 10b–5(b), which forbids a purchaser of securities "[t]o make any untrue statement of a material fact", catches Jakubowski's false representations on the forms. The district court granted summary judgment to the SEC after concluding that any reasonable trier of fact would be compelled

to find that these representations were made in connection with the issuance of securities, that the S&Ls would not have issued the stock had they known the truth about their beneficial ownership (hence that the lies were material), and that Jakubowski acted with scienter. He argues on appeal that each step of the district court's reasoning is mistaken.

■ Let us start with the requirement that the false statement be "in connection with the purchase or sale of any security"— language from § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), which authorized the SEC to promulgate Rule 10b–5. See generally *Blue Chip Stamps*; *Isquith v. Caremark International, Inc.*, 136 F.3d 531 (7th Cir.1998). Jakubowski made his statements directly to the issuer of securities, in order to induce the issuer to accept his offer to buy. The offer was accepted and the shares issued. How could there be a closer "connection" between statements and "the purchase or sale of any security"? Jakubowski does not deny this factual link; instead he relies on *Gurwara v. LyphoMed, Inc.*, 937 F.2d 380 (7th Cir.1991), for the proposition that the required "connection" is missing unless the misrepresentation concerns the value of the stock. This sounds more like an argument about materiality than about the "connection" between misrepresentation and the purchase or sale of securities, but never mind; this argument does not fit in either cubbyhole.

Gurwara attempted to exercise a stock option issued by his employer, which responded that he was no longer eligible to do so, having taken part-time status on account of disability. He sued under Rule 10b–5, contending that he had been inveigled into disqualifying himself from exercising the options. We held that the statements made to Gurwara concerning his status as an employee were not "in connection with the purchase or sale of any security" even though they turned out to have adverse consequences with respect to the options. *Gurwara* was foreordained by *Blue Chip Stamps*, which held that a misrepresentation that induces a decision *not* to purchase securities is outside the scope of § 10(b) and Rule 10b–5. Whether or not LyphoMed's statements

amounted to fraud, cf. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), any fraud could not have been "in connection with the purchase or sale of any security" because neither a purchase nor a sale ensued. In both *Blue Chip Stamps* and *Gurwara* stock had a bargain element that eluded a potential purchaser because of a deceit, which fell outside Rule 10b–5 because there was no sale. Here, too, stock was offered with a bargain element, which eluded *some* potential purchasers because Jakubowski mopped up the supply of shares and reduced the number allocated to depositors. Today's case is a variation on *Blue Chip Stamps*, with the difference that instead of the beneficiaries of the bargain offer being talked out of purchasing, persons who were excluded from the bargain offer used deceit to secure some of the stock. That is an actual sale. True enough, we wrote in *Gurwara* that the "misrepresentation went only to Gurwara's opportunity to purchase the stock at the described price. It in no way related to the value of that stock." 937 F.2d at 382. But this passage was irrelevant to the question whether the statements were "in connection with" a (nonexistent) purchase or sale. Dicta cannot control over the language of the statute.

If a misrepresentation must concern the value of the security in order to meet the "connection" requirement, then *United States v. O'Hagan*, — U.S. —, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), and *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), were wrongly decided. O'Hagan, a lawyer, used information about an impending tender offer to purchase the target's stock (and call options for its stock) in advance of the bid's announcement. The Court held that this violated Rule 10b–5 (and satisfied the "connection" requirement) because it misappropriated the bidder's property rights in information about the impending offer. — U.S. at —–—, 117 S.Ct. at 2209–11. Although O'Hagan had private information about the future price of the stock, he did not deceive the investors by trading at the market price; the bidder likewise could have purchased stock at the going price without violating Rule 10b–5. O'Hagan's actions wronged the bid-

der, not the persons from whom he bought stock; and as both the bidder and O'Hagan knew the details about the current and future prices of the stock, his acts did not relate to the value of the stock. The Court rejected an argument that would have limited Rule 10b–5's scope to frauds on other traders in the market and remarked that the statute "requires deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller." —— U.S. at ——, 117 S.Ct. at 2210. O'Hagan's acts affected *who* would receive the increase in price: O'Hagan filched an element of value that belonged to someone else, just as Jakubowski diverted to himself (and Hart) an element of value that depositors otherwise would have realized. Then there is *Naftalin*, a case under § 17 of the 1933 Act, 15 U.S.C. § 77q, which requires proof that the fraud occurred "in" an offer or sale of securities—a tighter link, one might suppose, than "in connection with". Naftalin instructed a broker to sell stock short for his account, incorrectly representing that he owned enough stock to cover the sale. Actually the sale was a "naked short"; Naftalin neither owned nor borrowed enough stock to deliver on demand, which not only violated exchange rules but also greatly increased the broker's risk of nonpayment if the price of the stock should rise in the market. The Court held in *Naftalin* that a customer's misrepresentation about whether he owns enough stock to cover a short sale violates § 17. Such a representation has nothing to do with the value of the stock; it concerns only who (as between customer and broker) bears the risk of future market movements. If a misrepresentation about ownership of shares is "in" the sale of stock, then Jakubowski's misrepresentation about who was buying the shares was "in connection with" the sale of stock.

Many of this court's cases say that a misrepresentation can be "in connection with" the purchase or sale of securities only if it influences an investment decision. E.g., *Isquith*, 136 F.3d at 534–36; *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931–32 (7th Cir.1988); *Harris Trust & Savings Bank v. Ellis*, 810 F.2d 700, 704 (7th Cir. 1987). Suppose a misrepresentation in connection with a corporate merger lulls the investor into foregoing an opportunity to file suit in state court charging the managers with violating their fiduciary duties. There may be a causal connection between the misrepresentation and a securities transaction; had suit been filed, the merger might not have occurred, and the exchange of securities that occurs in a merger—which can amount to a "sale"—also would have been averted. *Goldberg v. Meridor*, 567 F.2d 209, 218–21 (2d Cir.1977), holds that this sort of connection between the misrepresentation and a securities transaction satisfies § 10(b) and Rule 10b–5. *LHLC* and *Isquith* reject *Goldberg*, the forced-seller doctrine, and the fundamental-change doctrine, and insist that the wrongdoing affect an investment decision (as opposed to a litigation decision or an election to give the stock to one's children), in order to implement the holding of *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), that corporate mismanagement and similar wrongs do not violate Rule 10b–5 even though they may affect the price at which securities trade. But to say, as our cases do, that only investment decisions come within Rule 10b–5 is not to impose a further requirement that the wrong affect the price of the stock. *That* requirement would be unrelated to *Santa Fe* and would conflict with *O'Hagan* and *Naftalin*. Jakubowski and Hart made investment decisions when they purchased the stock issued by the converting S&Ls; their profits depended on reselling the securities they purchased; that they viewed these investments as sure things does not differentiate them from *O'Hagan*.

What we have said about the "connection" requirement suffices to establish materiality as well. The S&Ls would not have issued the stock had they known the identities of the real purchasers. Some proved this point by examining the applications, concluding that the proposed purchases were excessive in relation to the assets of the depositors in whose names Jakubowski had submitted applications to purchase stock, and contacting these depositors to inform them that a transfer of subscription rights was forbidden. At least two depositors withdrew

from the scheme as a result. Jakubowski's response?: he increased the purchases made in the names of other depositors that the S&Ls did not suspect of selling their subscription rights. To the extent *Kohler v. Kohler Co.*, 319 F.2d 634, 638 (7th Cir.1963), suggests that only statements concerning the value of a security can be "material" for purposes of federal securities law, it did not survive *O'Hagan* and *Naftalin*. The definition of "materiality" in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194, (1988), covers whatever is important enough to reasonable participants in an investment decision to alter their behavior. Usually price (or facts that influence price) is all that matters to securities transactions, but Rule 10b–5 does not foreclose the possibility that the participants will deem other facts vital. Close corporations often adopt provisions restricting equity ownership to employees and their families, and evasion of these limits could be highly material to the venture. In *Blue Chip Stamps* a judicial decree provided that the victorious plaintiffs in a class action would be compensated in discount stock rather than cash; again a deceit that enabled a non-member of the class to obtain some of the stock would have been material. Just so here. At the insistence of the OTS, the S&Ls made the identity of the purchaser a *sine qua non* in these transactions.

■ Last comes the question of scienter. Under *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), only persons who act with an intent to deceive or manipulate violate Rule 10b–5. *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044–45 (7th Cir.1977), holds that reckless disregard of the truth counts as intent for this purpose. Jakubowski depicts himself as a bankruptcy lawyer too wrapped up in handling major corporate reorganizations to be concerned about the minutiae of the S&Ls' offerings. How was he to learn about § 563b.3(i)(1) or qualifications on page 105 of some windy prospectus? Perhaps he was careless, Jakubowski allows, but he contends that a jury could conclude that he neither intentionally nor recklessly misstated any fact to the issuers—if not for all of the offerings, then for some. He adds that the Cragin purchase form did not explicitly forbid agreements to resell the stock, and that after reading this form and concluding that his conduct was proper, he didn't bother to read language in the other forms that would have alerted him to the problem. Careless again, Jakubowski allows, but not intentionally deceptive. The district judge patiently covered the details of the dozen transactions; it is enough to say that we agree with her decision and indicate the principal reasons why—reasons applicable to all transactions even on the assumption that Jakubowski did not read through the documents in his hands.

First, all of the forms Jakubowski completed explicitly stated that subscription rights could not be transferred, and all but two explicitly stated that depositors could not enter into pre-issuance agreements to resell shares they received. Reading these forms, and the prospectuses for the other two, did not require legal research. Over and again we say that people claiming to be *victims* of securities fraud may not claim to rely on oral statements inconsistent with written documents (even tedious prospectuses) available to them. E.g., *Carr v. CIGNA Securities, Inc.*, 95 F.3d 544 (7th Cir.1996); *Eckstein v. Balcor Film Investors*, 8 F.3d 1121 (7th Cir. 1993); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529–30 (7th Cir.1985); see also *Jackvony v. RIHT Financial Corp.*, 873 F.2d 411 (1st Cir.1989) (Breyer, J.). That is no less true when the person claiming ignorance of the writing made rather than received misstatements; for a lawyer to fail to read a document central to a business transaction is reckless indeed. Jakubowski also did not take any of the steps that would have been appropriate to a securities transaction at Skadden Arps. He says that a quick Lexis search did not turn up any cases condemning his chosen strategy, but he did not look for statutes or regulations—and, more to the point, he did not mention what he was doing to any banking or securities lawyer, let alone seek the opinion of a specialist. Deliberate ignorance,

the description of Jakubowski's mental state most favorable to him, is a form of knowledge. See *United States v. Ramsey*, 785 F.2d 184 (7th Cir.1986).

Second, the fact that Jakubowski was paid $50,000 for locating 12 holders of deposit accounts at S&Ls was enough by itself to put him on notice that something was amiss. Why did Jakubowski think that Hart was paying for depositors' names and subscription forms? Why, indeed, were forms being submitted *in* depositors' names? If subscription rights were transferable, then Hart could have obtained depositor lists from the S&Ls or placed an ad in the paper, and the purchase applications would have been submitted in the name of Generation Capital Associates. A secondary market in subscription rights would have developed, providing depositors with a greater portion of the anticipated gains. Jakubowski has no explanation, consistent with genuine belief in their propriety, for the structure of these transactions.

Third, Jakubowski received notice from at least two S&Ls, plus another lawyer at Skadden Arps, that depositors could not transfer their subscription rights. His response was to reroute purchases through the accounts of depositors whose applications the banks had not identified as suspicious and to create bogus documents to cover his trail. These steps yield irrefutable evidence of intent to deceive. In the Calumet transaction, for example, Jakubowski prepared papers purporting to show that Generation Capital Associates was loaning money to the depositors so that they could purchase the shares for their own accounts. The documents were fictions, no money was loaned; the depositors never received the shares and took no risk of loss (and stood to reap only small fractions of any gain). The documents did not state the duration of the loans or the rates of interest to be paid, for such details were irrelevant given the absence of an extension of credit. Adding icing to the cake, Jakubowski backdated some of these documents so that it would appear that the "loans" preceded the banks' inquiries.

What there is to be said on Jakubowski's behalf—that he was busy, that he was not a securities or banking lawyer, and so on—could not persuade a reasonable trier of fact on any of the disputed questions. Summary judgment therefore was in order and is

AFFIRMED.