In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1327

STARK TRADING and SHEPHERD
    INVESTMENTS INTERNATIONAL LTD.,

*Plaintiffs-Appellants*,

*v.*

FALCONBRIDGE LIMITED and
    BRASCAN CORPORATION,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 05-C-1167—**Aaron E. Goodstein**, *Magistrate Judge*.

ARGUED SEPTEMBER 8, 2008—DECIDED JANUARY 5, 2009

Before POSNER, KANNE, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs have appealed from the dismissal, for failure to state a claim, of their securities fraud suit. The suit is based primarily on the Securities and Exchange Commission's Rule 10b-5. The

claims they make under other provisions of federal securities law—all but section 11 of the Securities Exchange Act, 15 U.S.C. § 77k, which we discuss at the end of this opinion—fall with the 10b-5 claim.

The parties have spent too much time in this court, as they did in the district court, arguing over whether the typically Brobdingnagian complaint (289 paragraphs sprawling over 85 pages) adequately alleges scienter, as required by 15 U.S.C. § 78u-4(b)(2). (The suit is more than three years old, yet it has not progressed beyond the motion to dismiss stage.) A claim of fraud fails if there is no proof that the plaintiff relied to his detriment on the defendant's misrepresentations or misleading omissions. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 180 (1994); *Isquith v. Caremark Int'l, Inc.*, 136 F.3d 531, 534, 536 (7th Cir. 1998). "[W]ithout reliance, fraud is harmless." *Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 619 (7th Cir. 1991). So implausible is an inference of reliance from the complaint in this case when read in conjunction with documents of which the court can take judicial notice, *Deicher v. City of Evansville*, 545 F.3d 537, 541-42 (7th Cir. 2008); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999), that the dismissal of the 10b-5 claim must be affirmed without regard to scienter or the other issues that the parties have spent years jousting over.

The complaint tells the following story. Brascan Asset Management, Inc. (now called Brascan Corporation) owned 41 percent of the common stock of Noranda, Inc., which

in turn owned 59 percent of Falconbridge, Inc., both being large Canadian mining companies. Brascan wanted to get out of Noranda. It was able to cause Noranda to offer Noranda's common stockholders, who of course included Brascan, preferred stock in exchange for their common stock. (That is called an issuer bid.) Noranda agreed to redeem the preferred stock for cash, at a price of $25 a share, which exceeded the current market value of the common stock. By redeeming, Brascan would be able to exchange its shares for cash and thus achieve its objective of getting out of Noranda. Why it didn't cause Noranda simply to offer $25 per share to all the common stockholders, thus cutting out the intermediate swap of common for preferred, is not explained, but probably was connected with the next and critical transaction, for which Noranda needed a lot of its common stock.

For on the same day that it announced the issuer bid (March 9, 2005), Noranda also announced that it would offer every minority shareholder in Falconbridge 1.77 shares of Noranda common stock for each share of Falconbridge common stock that the shareholder tendered. The offer was conditioned on being accepted by more than half the minority shareholders (the half being weighted of course by number of shares).

The offer succeeded, and the two hedge funds that are the plaintiffs in this case were among the minority shareholders who tendered their stock by the expiration date, May 5. Three months later, Noranda and Falconbridge merged. The resulting firm was named Falconbridge Limited, and was eventually acquired by a Swiss mining

company named Xstrata. But in October 2005, before that acquisition, another mining company, Inco, offered to buy Falconbridge Limited at a price substantially above the tender-offer price (1.77 shares of Noranda common stock for every share of Falconbridge common stock) that the plaintiffs had received for their Falconbridge stock.

The plaintiffs had begun buying that stock on March 17; they do not say when they stopped, except that it had to be before the May 5 deadline for tendering. They had bought into Falconbridge because they thought the company was worth more than its current capitalization by the stock market. At the same time that they had bought Falconbridge shares they had sold some Noranda stock short, apparently as a hedge. According to the complaint, Falconbridge was Noranda's major asset (how major, no one has bothered to tell us), so if its shares fell in value or even just failed to rise Noranda's share price would probably fall and the plaintiffs would obtain some profits from their short sales to offset the lack of profit from being long in Falconbridge. By the same token, if Falconbridge's stock rose in price Noranda's stock price probably would rise too and if it did the plaintiffs would lose money from their short sale. But they thought Falconbridge stock more likely to rise, and so invested much less in selling stock in Noranda short than in buying stock in Falconbridge.

Brascan states in its brief that the plaintiffs hoped to make money both from Falconbridge's stock price rising and Noranda's falling. That's a misunderstanding of hedging. The prices of the two companies were going to move in the same direction, but by going long in one

and short in the other the plaintiffs were reducing the variance in the expected return on their investments. That is what hedging means. But this is an aside.

In a typical Rule 10b-5 case, the plaintiff buys stock at a price that he claims was inflated by misrepresentations by the corporation's management and sells his stock at a loss when the truth comes out and the price plummets. Our plaintiffs believed they were buying an undervalued stock, and events after their purchase, culminating in Xstrata's purchase of Falconbridge Limited (Falconbridge's successor) at a high price, proved them correct. They do argue that the issuer bid (the offer to swap preferred stock in Noranda for common stock) inflated the apparent value of Noranda stock, and therefore made the offer of Noranda stock for Falconbridge stock look generous. But they were not fooled. They knew that the tender offer undervalued Falconbridge—that Noranda was trying to buy out the minority shareholders (thus including the plaintiffs) cheap.

They admit that before the period for tendering their Falconbridge shares to Noranda expired, they "became aware of some of the inaccuracies in the offering documents"—and that is an understatement. On April 29, a week before the deadline in the tender offer, they wrote a letter to the Ontario Securities Commission that alleges, and in considerable detail (the letter, including enclosures, runs to 21 pages, much of it in fine print), most of the facts that their complaint charges as fraud, such as: (1) concealing a conflict of interest of the investment bank that had provided a valuation of Falconbridge for the tender offer, and of the special committee of Falcon-

bridge that had advised Falconbridge's minority share-holders to accept the offer on the basis of the investment bank's valuation, and (2) overstating Noranda's value, thus enabling Noranda to pay for Falconbridge in a thoroughly debased currency (Noranda's overvalued stock), which further reduced the real price at which Noranda was able to buy out Falconbridge's minority shareholders.

The plaintiffs must have been gratified to learn, from their perceiving the "inaccuracies" in the tender-offer registration statement, that they had been right that Falconbridge was undervalued; their letter to the securities commission was calculated to force Noranda to sweeten its offer (though that never happened). But they say in paragraph 205 of the complaint, which is the heart of their case, that they were afraid that the tender offer would succeed and that unless they tendered their shares they would be squeezed out and Canadian law, which governs the squeezing out of minority shareholders in a Canadian corporation, would not protect them, as U.S. law does, from a predatory majority shareholder.

The mystery deepens. Since the tender offer would have failed by its own terms had not a majority of the minority shareholders tendered, why didn't the plaintiffs try to dissuade the other minority shareholders from tendering? Why didn't they mail them copies of the letter to the securities commission or publicize the letter in the financial press? The minority shareholders owned in the aggregate some 78 million shares, 5.5 million of which were owned by the plaintiffs. Noranda needed to obtain at least 39 million shares for the tender offer to succeed. If the plaintiffs refused to tender, Noranda

would have to obtain 54 percent of the shares held by the remaining minority shareholders, and it might fail to do so in the face of a vigorous campaign of public opposition to the offer, mounted by the plaintiffs.

Whatever the plaintiffs were thinking—the complaint says virtually nothing about their strategy—we cannot find any basis for inferring that they relied on the defendants' bad mouthing of Falconbridge. They knew better. They knew Falconbridge was worth a lot—that's why they invested. They thought the tender offer price was too low and that Noranda had resorted to fraud to make it succeed. They had known they were buying into a company that had a majority shareholder, that it was a Canadian company, and therefore that a minority shareholder would not have the same legal protections (such as appraisal rights) that minority shareholders in U.S. corporations have. They also had to know that since they thought Falconbridge undervalued, so would Noranda, which would therefore try to buy out the minority shareholders before the market revalued Falconbridge upward. That would not be a nice way to treat minority shareholders but "securities fraud does not include the oppression of minority shareholders . . . . No more does securities fraud include unsound or oppressive corporate reorganizations." *Isquith v. Caremark Int'l, Inc.*, *supra*, 136 F.3d at 535; see *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 473-77 (1977). And a week before the deadline for tendering their shares, the plaintiffs revealed in their letter to the securities commission the evidence that Brascan and Noranda were trying to pull a fast one on the minority shareholders.

But though the plaintiffs didn't rely on Noranda's undervaluation of Falconbridge, maybe other minority shareholders did and foolishly tendered, as a result of which the tender offer succeeded and the plaintiffs were left in the vulnerable position of minority share-holders (where of course they had been from the start). But believing that Falconbridge was undervalued and that the value estimates publicly disseminated by Noranda were inaccurate, why, to repeat, didn't the plaintiffs communicate their belief directly or indirectly to the Wall Street analysts? Such information spreads fast and would have given the other minority share-holders pause.

This assumes that the plaintiffs knew something about the tender offer that other investors did not know. That is unlikely, since the plaintiffs were not insiders. Almost certainly there was no deception but just a difference of opinion in the investor community about the signifi-cance of the widely known circumstances of the tender offer. And if there *was* deception and the other minority shareholders were too dumb to perceive it even after being warned, why didn't the plaintiffs sue to enjoin the tender offer?

If contrary to the common sense of the situation other minority shareholders were fooled even though the plaintiffs were not, this might seem to allow the plaintiffs recourse to the doctrine of fraud on the market. *Basic Inc. v. Levinson*, 485 U.S. 224, 243-47 (1988). If a fraud affects the price of a publicly traded security, investors will be affected even if they trade without knowledge of the

misrepresentations that influenced the price at which they traded. They are "relying," albeit indirectly, on the misrepresentations. " '[R]eliance' is a synthetic term. It refers not to the investor's state of mind but to the effect produced by a material misstatement or omission. Reliance is the confluence of materiality and causation. The fraud on the market doctrine is the best example; a material misstatement affects the security's price, which injures investors who did not know of the misstatement." *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1170 (7th Cir. 1995); see *Isquith v. Caremark Int'l, Inc.*, *supra*, 136 F.3d at 536; cf. *Plaine v. McCabe*, 797 F.2d 713, 717 (9th Cir. 1986).

So suppose some of the minority shareholders were induced by Noranda's misrepresentations to tender their shares, and others, though unaware of any representations, tendered their shares as well. They too would be victims of deception, because had the market known the truth the tender offer would have failed. Cf. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970). But no one who saw through the fraud would be able to sue for fraud, for he could not have relied directly or indirectly. And that was the plaintiffs' position. Sophisticated investors, they must have considered the combination of the tender-offer price and a later suit (this suit) against the defendants a better deal than holding on to their shares and by doing so, and disseminating their doubts, trying to defeat the tender offer. That is not a strategy that the courts should reward in the name of rectifying securities fraud.

So even if the other minority shareholders were blind sheep and the law impotent to prevent a dishonest

tender offer, the plaintiffs would not have a claim under Rule 10b-5, or any other securities law requiring proof of reliance, because they were never deceived. At worst they were minority shareholders victimized by a heart-less majority shareholder (remember that Noranda owned 59 percent of the common stock of Falconbridge), and as we noted earlier the federal law of securities fraud does not provide a remedy for oppression of minority share-holders. The lack of merit of the 10b-5 claim would be obvious had the plaintiffs refused the tender offer and later been squeezed out, as in the *Santa Fe Industries* case; but there is no pertinent difference between the two types of case.

This leaves for consideration the plaintiffs' claim under section 11 of the Securities Exchange Act, which does not require proof of reliance. Section 11 provides that "in case any part of the registration statement, when such part became effective, contained an untrue state-ment of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person [with an immaterial exception] acquiring such security" may sue. 15 U.S.C. § 77k(a). But the plaintiff in such a suit may recover (so far as pertains to this case) only "such damages as shall represent the difference between the amount paid for the security . . . and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit." § 77k(e).

The plaintiffs gave up each of their Falconbridge shares for 1.77 Noranda shares. On May 5, 2005, the date the

tender offer expired, Falconbridge stock was trading at $39.59 (Canadian), so that was the price that the plaintiffs paid for the Noranda shares that they received in exchange. On November 7, 2005, the date on which they filed their lawsuit, a share in Falconbridge Limited (the new Falconbridge, after its merger with Noranda) was trading at C$34.43, so that the 1.77 Noranda shares that the plaintiffs had received in exchange for each share of Falconbridge were now worth C$60.94, which exceeded by C$21.35 what they had paid for the shares when they accepted the tender offer. The plaintiffs coyly suggest that maybe they sold their shares, or some of them, before they sued, and sustained a loss. But this is nowhere suggested in the complaint, or in the brief that the plaintiffs filed in the district court after the defendants pointed out that the plaintiffs had failed to allege that they had sold any of their shares at a loss. It would not make sense for them to have sold their shares at a loss, since they were convinced that Falconbridge was undervalued.

The complaint's silence is deafening. Even notice pleading requires pleading the elements of a tort, and one element of the section 11 tort is sale at a loss. Moreover, the complaint in a complex case must, to avert dismissal for failure to state a claim, include sufficient allegations to enable a judgment that the claim has enough possible merit to warrant the protracted litigation likely to ensue from denying a motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Limestone Development Corp. v. Village of Lemont*, 520 F.3d 797, 802-03 (7th Cir. 2008). This suit was dismissed by the district court in January 2008,

more than two years after it had been filed. Just imagine how long it would have taken to dispose of the case by summary judgment after the usual pretrial discovery in a big commercial case. Defendants are not to be subjected to the costs of pretrial discovery in a case in which those costs, and the costs of the other pretrial maneuvering common in a big case, are likely to be great, unless the complaint makes some sense. If after 85 pages of huffing and puffing in the complaint, and another 83 pages of appellate briefs, sophisticated investors cannot make their case seem plausible, the litigation must end then and there.

AFFIRMED.