**Lewis JACOBS and Robert B. Ourisman, as representatives of a class of persons similarly situated, Plaintiffs,**

**v.**

**WINTHROP FINANCIAL ASSOCIATES, Three Winthrop Properties, Inc. First Winthrop Corporation, NIA Operating Associates Limited Partnership, Sherburne Associates Limited Partnership, Zero Main Associates Limited Partnership, and Apollo Real Estate Investment Fund II, L.P., Defendants,**

**No. CIVA99-CIV-11363–WGY.**

United States District Court,
D. Massachusetts.

Dec. 21, 1999.

George W. Croner, Kohn, Swift & Graf, P.C., Philadelphia, PA, Mark S. Williams,

Law Office of Mark S. Williams, Cambridge, MA, for Lewis D. Jacobs, Robert B. Ourisman, Plaintiffs.

John J. Tumilty, Edwards & Angell, LLP, Barbara L. Moore, Edwards & Angell, LLP, Boston, for Winthrop Financial Associates, Three Winthrop Properties, Inc., First Winthrop Corp., NIA Operating Associates Limited Partnership, Sherburne Associates Limited Partnership, Zero Main Associates Limited Partnership, Apollo Real Estate Investment Fund II, L.P., Defendants.

## MEMORANDUM

YOUNG, Chief Judge.

## I. INTRODUCTION

The representative plaintiffs in this putative class action (the "Limited Partners"), bring a multi-count securities complaint against the Managing General Partner and various controlling entities (collectively, "Winthrop") of the Nantucket Island Associates Limited Partnership (the "Partnership"). In addition to assorted state law claims sounding in contract, the Limited Partners allege that Winthrop violated federal securities laws by manipulating a September 1996 offering (the "Prospectus" or the "Offering") of "Preferred Units" in the Partnership. According to the complaint, the Prospectus painted a gloomy picture of both the financial health of the Partnership and the worth of the Preferred Units to discourage the Limited Partners from participating in the Offering. Winthrop ultimately acquired 83% of the Preferred Units for itself and subsequently effectuated the sale of many of the Partnership's assets. According to the terms of the Offering, the proceeds from the sale benefitted only the owners of the Preferred Units. The Limited Partners, none of whom purchased Preferred Units, essentially allege that Winthrop orchestrated the Offering to cheat them out of the value of their investment in the Partnership. By the instant motion to dismiss, Winthrop challenges the Limited Partners' standing under the securities laws and the sufficiency of the complaint under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 (the "Act"). This opinion further explains the Court's reasoning for granting the motion to dismiss at oral argument.

## II. FACTS DERIVED FROM THE COMPLAINT

The Partnership is a limited partnership organized in 1987 to beneficially own and operate a portfolio of properties located on Nantucket Island including two hotels, 51 retail buildings, 40 rental units, a boat basin, and employee housing (the "Property"). See Compl. ¶¶ 11, 18. By 1995, the Partnership began experiencing financial difficulties and did not make cash distributions to the Limited Partners. See id. ¶¶ 28-32. In September 1996, Winthrop caused the Prospectus to be distributed to the Limited Partners which issued subscription rights for the purchase of Preferred Units in the Partnership. See id. ¶¶ 34, 37-38. Each Preferred Unit had a subscription price of $13,333 and entitled the holder thereof to receive (i) one seventh of one vote on all matters on which Limited Partners were entitled to vote, (ii) a cumulative compounded preferred annual return of 8% from the Partnership's available cash flow, and, most importantly in this case, (iii) a preferred aggregate cumulative cash distribution equal to 250% of the preferred invested capital to be paid from the net proceeds from any capital transactions or liquidation by the Partnership (the "Preferred Distribution Provision"). See id. at ¶¶ 39-40. Of note, the Prospectus also provided that removal of Winthrop as General Partner without its consent would accelerate the Preferred Distribution Provision so as to require the immediate redemption of the Preferred Units (the "Removal Provision").[1]

1. The text of the Removal Provision, which is     included in the Plaintiffs' reply memorandum

The Limited Partners contend that the Prospectus unfairly portrayed the Preferred Units as a risky investment. Specifically, the Prospectus stated that the Partnership would not have had sufficient funds to pay the 8% preferred annual return in 1995 and could not be expected to pay the return in 1996. *See id.* at ¶ 44. Moreover, rather than describing a future intent to sell the Partnership's assets, the Prospectus advises the Partnership to approve capital improvements to the Property. *See id.* at ¶¶ 45-46, 48. Consequently, the Limited Partners did not convert their subscription rights into Preferred Units. *See id.* at ¶¶ 17, 55.

On May 12, 1997, Winthrop informed the Limited Partners that it had itself acquired 83% of the Preferred Units and reported that an extensive capital improvement program was underway at the Property. *See id.* at ¶ 57. Approximately a year later, however, Winthrop informed the Limited Partners that it had sold the Partnership's two hotels, boat basin, and rental units (the "1998 Sale").[2] *See id.* at ¶ 58. As a result of the Preferred Distribution Provision, the proceeds from the 1998 Sale were paid only to the holders of Preferred Units rendering the Limited Partners' economic interest in the partnership "effectively worthless." *See id.* at ¶¶ 58-59, 68, 72.

Feeling cheated, the Limited Partners filed a five-count class action complaint against Winthrop on June 25, 1999. The first two counts allege that Winthrop violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5 (collectively, "Section 10[b]"). Counts three through five respectively assert claims for breach of contract, breach of fiduciary duty, and unjust enrichment under state law. Winthrop filed the instant motion to dismiss Counts I and II of the complaint for lack of standing under Section 10(b) and insufficiency under the Act. Winthrop also asked the Court to decline supplemental jurisdiction over the remaining state law claims in the event that it granted the motion to dismiss Counts I and II.

## III. ANALYSIS: THE FORCED SELLER DOCTRINE

For a misrepresentation or omission to be actionable under Section 10(b), it must have been made "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749 (1975), the United States Supreme Court interpreted the "in connection with" language to allow only actual purchasers and sellers of securities to bring an action under Section 10(b). Moreover, *Blue Chip Stamps* rejected standing for "potential purchasers ... who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was." *Id.* at 737, 95 S.Ct. 1917. Despite the clear message of *Blue Chip Stamps,* the federal courts have fashioned a "forced seller" doctrine to provide standing for a non-selling plaintiff in cases where "the fundamental nature of a plaintiff's investment has been changed without an actual sale ... through circumstances beyond the plaintiff's control ...." Richard B. Galla-

and attached affidavit, is referred to but vaguely in the Complaint. *See* Compl. ¶ 47 ("The Prospectus does not disclose to Plaintiffs and the Limited Partners that the Winthrop Defendants' purchase of Preferred Units would effectively eliminate the Limited Partners' right, provided in the Partnership Agreement, to remove the General Partner because of the overwhelming financial cost associated with such a removal following the Winthrop Defendants' acquisition of the Preferred Units."). To give the Plaintiffs' the best possible record, however, the Court considers the motion to dismiss as though the Removal Provision had been properly alleged.

**2.** By process of elimination, the Partnership's assets after the sale still include 51 retail buildings and employee housing.

gher, "Who is 'Forced Seller' for Purposes of Maintenance of Civil Action Under § 10(b) of Securities Exchange Act of 1934 (15 U.S.C.A. § 78j[b]) and SEC Rule 10b-5," 59 A.L.R. Fed. 10 (1998). Recognizing that they were neither purchasers nor sellers of securities, the Limited Partners rely completely upon the forced seller doctrine for standing under Section 10(b). *See* Compl. ¶¶ 69-70.

Winthrop challenges the Limited Partners' standing under the forced seller doctrine on three grounds. First, Winthrop argues that the doctrine applies only to short form mergers, not the offering of preferred units in a limited partnership. Second, Winthrop reasons that -- even if the doctrine could hypothetically be extended to the type of securities transaction in the case at bar -- the Limited Partners are not forced sellers because their investments have merely been diluted. Third, in light of recent cases, Winthrop challenges the continued viability of the forced seller doctrine. In response, the Limited Partners argue that the forced seller doctrine has been applied in a variety of contexts, including limited partnership transactions. In opposition to Winthrop's dilution argument, the Limited Partners contend that the Partnership "has no continuing economic viability and ... the Limited Partnership Units owned by Plaintiffs and the Class have been rendered worthless." Pl. Opp. Mem. at 11.[3] Moreover, the Limited Partners claim a change in the fundamental character of their investment because Winthrop's purchase of 83% of the Preferred Units coupled with the Removal Provision "served to eliminate, for all practical purposes, the limited partners' right, embodied in [the] ... Partnership Agreement, to remove the General Partner." Pl. Opp. Mem. at 7.

Not surprisingly, there is significant debate among the federal courts as to the applicability, intricacies, and continued existence of the forced seller doctrine. *See generally* Gallagher, 59 A.L.R. Fed. 10. Although the First Circuit has not yet chimed in, the decisions of three judges in this District, and two other judges in the First Circuit, collectively articulate a sound and consistent application of the forced seller doctrine which guides the Court's decision here.

This Court first considers the decisions in this District. Contrary to Winthrop's position, Judge Skinner approved the use of the forced seller doctrine in the context of a limited partnership. *See Fulco v. American Cable Sys.of Florida,* Civ. A. No. 89-1342-S, 1989 WL 205356 (D. Mass Oct. 4, 1989) (Skinner, J). Despite the extension of the doctrine to the type of transaction at issue here, however, Judge Skinner stated that the forced seller doctrine "has been extended to include those whose investment has been fundamentally changed from an interest in a going enterprise into a right *solely to a payment of money.*" *Id.* at * 3 (emphasis added) (internal quotation omitted). Moreover, Judge Skinner recognized that "[c]ourts in this circuit have resisted broadening the doctrine to include investors holding securities *they claim have been rendered valueless.*" *Id.* (emphasis added). In the end, Judge Skinner concluded that the involuntary redemption of limited partnership units was "indistinguishable" from a dissolution, and found standing. *See id.*

Likewise, in a slightly older but more notable case, Chief Judge Caffrey considered the forced seller doctrine in the context of an allegedly fraudulent bank foreclosure sale and repurchase that had allegedly "changed the nature of the in-

---

**3.** In the alternative, the Limited Partners conclude that the continuing economic viability of the Partnership is a matter of factual dispute "not suited for disposition on a motion to dismiss." Pl. Opp. Mem. at 10 n.10. In light of the First Circuit's admonition in *United States v. AVX Corp.,* 962 F.2d 108, 115 (1st

Cir. 1992), that "the facts necessary to support standing must clearly appear in the record and cannot be inferred argumentatively from averments in the pleadings," the Court can and does consider the Partnership's continuing economic viability on the allegations in the complaint standing alone.

vestment of plaintiffs ... from an interest as a shareholder in a going enterprise into a worthless interest in a shell corporation." *Arnesen v. Shawmut County Bank,* 504 F.Supp. 1077, 1081 (D. Mass. 1980) (Caffrey, C.J.). Yet, even assuming that "plaintiffs were left with stock of little value in an ongoing corporate entity that had ceased its active existence but had not been liquidated," *id.,* the court refused to construe the forced seller doctrine broadly in the absence of a formal liquidation. *See id.* at 1082. In Chief Judge Caffrey's opinion, "[t]he plaintiffs speak here, not principally as investors, but as shareholders complaining of alleged corporate mismanagement." *Id.*

Finally, in a decision predating *Blue Chip Stamps,* Judge Ford was asked to apply the forced seller doctrine in the context of a limited partnership transaction. *See Feldberg v. O'Connell,* 338 F. Supp. 744 (D. Mass. 1972) (Ford, J.). In *Feldberg,* a group of limited partners alleged that fraudulent financial statements prevented them from dissolving the partnership at a time when such dissolution would still have been profitable. Although a majority of the limited partners eventually withdrew from the partnership and "the partnership would therefore be liquidated ...," the liquidation had not been fully carried out when the plaintiffs filed the complaint. *Id.* at 746. Judge Ford nevertheless upheld the plaintiffs' standing because future liquidation was a certainty. *See id.* at 746–747 ("However, this move by other partners to liquidate the partnership clearly establishes the plaintiffs as forced sellers with standing to bring this action.").

The two decisions from other District Courts in the First Circuit reveal similarly narrow constructions of the forced seller doctrine. First, in *Batchelder v. Northern Fire Lites, Inc.,* 630 F.Supp. 1115 (D.N.H. 1986) (Devine, C.J.), the court refused to apply the forced seller doctrine in favor of shareholders who argued that a manufacturer's allegedly fraudulent sale of its ma-

jor asset "effectively rendered their shares ... valueless." *Id.* at 1120. The court reasoned that the manufacturer "continue[d] to exist as a corporation, albeit as a shell, and plaintiffs continue to possess ... twenty percent ownership ...." *Id.* Likewise, in *Rodriguez Cadiz v. Mercado Jimenez,* 579 F. Supp. 1176 (D.P.R. 1983) (Pieras, J.), the District Court rejected the forced seller doctrine where a plaintiff still owned his stock. *See id.* at 1180–81.

■ On the whole, these decisions demonstrate that the forced seller doctrine is inapplicable to the case at bar. Even if the Limited Partners' investment in the Partnership is currently worthless -- arguably an unsupportable conclusion in light of its continuing ownership of 51 retail buildings -- there is no question but that the Limited Partners retain their interest in an existing business. *See, e.g.,* Compl. ¶ 3 ("Plaintiffs ... are limited partners in the [Partnership]."). While *Fulco* and *Feldberg* indicate that the forced seller doctrine may be applied in the context of a limited partnership transaction, there appears to be agreement that actual liquidation of the investment entity must be complete, *see Arnesen,* or, at the very least, a forgone conclusion, *see Feldberg.* The complaint fails to demonstrate that liquidation of the Limited Partners' investment is even a remote possibility. Accordingly, even presuming that the Limited Partners' holdings are worthless, the Court will not depart from the well-reasoned decisions described above.

■ As a final note, the Limited Partners' argument that the loss of the power to remove Winthrop as Managing Director is a fundamental change worthy of triggering the forced seller doctrine, while interesting, has no foundation in the case law. Rather, in at least one federal decision that addressed a similar argument, the court rejected application of the forced seller doctrine. *See McCloskey v. McCloskey,* 450 F.Supp. 991, 995 (E.D. Pa. 1978) (rejecting standing of shareholder induced by material misrepresentations to sign a voting trust).

IV. CONCLUSION

For the aforementioned reasons, the Court granted the motion to dismiss Counts I and II of the Complaint from the bench and, pursuant to 28 U.S.C. § 1367, ordered the remaining state law claims remanded to the Superior Court of the Commonwealth of Massachusetts sitting in and for the County of Suffolk.[4] The order of remand is stayed, however, until either an appeal of this decision is determined or until the time for appeal has run. This procedure is necessary both to provide a fully final order which is appealable and, at the same time, hold this case together as one proceeding in the event that the Court of Appeals reverses the order dismissing the federal claim. Compare this Court's less than stellar performance in *Stark v. Advanced Magnetics, Inc.*, 894 F.Supp. 555 (D.Mass. 1995), *rev'd* 119 F.3d 1551 (Fed.Cir. 1997), where this Court dismissed federal patent claims and remanded state claims, only to get the case back after reversal on appeal at a time when the remanded state action had mushroomed in complexity. I seek to avoid such an injudicious use of judicial resources in the future.

---

4. While the parties differ on the propriety of remand, if remand is to take place they jointly recommend remand to the Suffolk Superior Court rather than the Nantucket Superior Court since parallel state proceedings are already pending in Suffolk.