Reginald H. HOWE Plaintiff,

v.

BANK FOR INTERNATIONAL SETTLEMENTS, Alan Greenspan, William J. McDonough, J.P. Morgan & Co. Inc., Chase Manhattan Corp., Citigroup, Inc., Goldman Sachs Group. Inc., Deutsche Bank AG, and Lawrence H. Summers, in his individual capacity, Paul O'Neill, Secretary of the Treasury Defendants.

No. CIV.A. 00–CV–12485–R.

United States District Court, D. Massachusetts.

March 26, 2002.

Reginald H. Howe, Belmont, Pro se.

Robert J. Kaler, Gadsby & Hannah LLP, George B. Henderson, U.S. Attorney's Office, Boston, Richard M. Ashton, Katherine H. Wheatley, Stephen H. Meyer, Board of Governors of the Federal Reserve System, Washington, DC, John C. Englander, J. Anthony Downs, Goodwin Procter LLP, James R. Carroll, Skadden, Arps, Slate, Meagher & Flom, John D. Donovan, Jr., Ropes & Gray, Christopher R. Dillon, Ropes & Gray, Brian E. Pastuszenski, Testa, Hurwitz & Thibeault, Matthew A. Martel, Testa, Hurwitz & Thibeault, Boston, Jonathan I. Blackman, Mitchell A. Lowenthal, Allyson W. Haynes, Cleary, Gottlieb, Steen & Hamilton, David D. Joy, David S. Cohen, Office of the General Counsel, U.S. Department of the Treasury, Washington, DC, for Alan Greenspan, J.P. Morgan & Co., Inc., Chase Manhattan Corp, Citigroup, Inc., Goldman Sachs Group, Inc., Deutsche Bank AG, Lawrence H. Summers, in his individual capacity, Bank for International Settlements, Treasury, Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

LINDSAY, District Judge.

### I. Introduction

This case involves allegations of "an unholy alliance of high public officials" and "large bullion banks" to manipulate the price of gold. Compl. ¶ 82. The plaintiff, Reginald H. Howe (the "plaintiff" or "Howe"), asserts that various combinations of the defendants committed two interrelated sets of wrongful acts: first, that all of the defendants conspired to depress the price of gold; and second, that a subset of the defendants conspired to set an unfairly low price in the mandatory redemption of shares of the Bank for International Settlements (the "BIS").[1] The plaintiff translates these factual allegations into four legal claims against eight defendants:

(1) that all of the defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1;

(2) that Chairman of the Board of Governors of the Federal Reserve System, Alan Greenspan ("Greenspan"); President of the Federal Reserve Bank of New York, William J. McDonough ("McDonough"); J.P. Morgan Chase & Co. ("Morgan Chase");[2] and the BIS (collectively "the BIS defendants") violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5;

(3) that the BIS defendants committed common law fraud and breaches of fiduciary duty; and

(4) that Greenspan, McDonough, former Secretary of the Treasury Lawrence Summers ("Summers"),[3] and the BIS violated

---

1. The parties have used different terms for this transaction. The defendants refer to it as a "mandatory share redemption," while the plaintiff prefers "freeze-out." My use of the former does not imply any opinion as to the merits or demerits of this transaction.

2. The complaint identifies J.P. Morgan & Co. and Chase Manhattan Corp. as separate defendants. As represented in the Memorandum in Support of J.P. Morgan Chase & Co.'s Motion to Dismiss ("Morgan Mem."), these two defendants merged on December 31, 2000. Morgan Mem. at 1 n. 1.

3. At an earlier point in these proceedings, I granted a motion of Summers to substitute the current Secretary of the Treasury, Paul O'Neill ("O'Neill"), for Summers to the extent that the claims are against Summers in his official capacity. Although the complaint itself is unclear on the matter, the plaintiff argues that his claims against Summers are made against him both in his official capacity

the Fifth Amendment of the Constitution by depriving him of property without due process of law.

The defendants have each filed motions to dismiss all of the counts against them on various grounds. These motions and the motion of the United States to be substituted as a defendant for Greenspan with respect to Count 3 are now before the court. For the reasons stated below, I grant all of the motions.

## II. Background

The facts set forth below are those alleged in the complaint as well as uncontested matters of public record, which have been adverted to by the parties in their papers. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir.2001) (noting that a district court properly may consider matters of public record in deciding 12(b)(6) motions to dismiss). I must accept as true the allegations in the complaint and construe in the plaintiff's favor all reasonable inferences from those allegations. *Id.*

Howe describes himself in the complaint as "the proprietor of The Golden Sextant (www.goldensextant.com), an internationally recognized website containing commentaries, essays and analyses relating to gold, and a member of Golden Sextant Advisors LLC." Compl. ¶ 2. He brings this action pro se, as the holder of six shares in the BIS and 1200 shares of Gold–Denominated Preferred Stock, Series II, of Freeport–McMoran Copper & Gold, Inc. *Id.* In addition to the defendants specifically identified above, he also names as defendants Citigroup, Inc. ("Citigroup"), the Goldman Sachs Group, Inc. ("Goldman"), and Deutsche Bank AG ("Deutsche Bank").

## A. The Alleged Gold Price–Fixing Conspiracy

The complaint avers the following with respect to the alleged conspiracy to fix the price of gold.

Gold was long at the center of the international monetary system. From 1792 until 1971, it had an official monetary role in the United States. Compl. ¶ 17. Since the demise of the Bretton Woods system in 1971, however, gold has become, at least in theory, an ordinary commodity, whose price is determined by the market forces of supply and demand. *Id.* ¶ 20. Many nations and central banks continue to hold substantial gold reserves, although a number have sold off some or all of their reserves in recent years. *Id.* ¶¶ 21, 26; *see also, e.g.,* THE COMPTROLLER AND AUDITOR GENERAL, HM TREASURY, *EXECUTIVE SUMMARY TO* THE SALE OF PART OF THE UK GOLD RESERVES 4 (2001) (hereinafter "SALE OF UK GOLD RESERVES").

In recent years, the annual production of gold from mining has been approximately 2,500 metric tons per year. Compl. ¶ 26. Demand has been higher, averaging more than 4,000 metric tons annually. *Id.* Notwithstanding the annual excess of demand over supply, gold prices are well below the total cost of production for most mines, forcing the closure of a number of mines. *Id.* According to the plaintiff, the deficit between new mine supply and demand has been met by scrap recovery, by some sales of official gold, and most importantly by leased gold, largely from central banks. *Id.*

Gold is traded in many international markets; the most important, from the perspective of the allegations in this case, are the London Bullion Market Association ("LBMA") and the Commodities Exchange

and in his individual capacity. *See* Plaintiff's Consolidated Opposition to All Motions To Dismiss and Related Motions, Including Request for Jury Trial on Any Unresolved Issues Relating to Arbitration ("Consolidated Opp'n") at 59.

("COMEX") in New York. *Id.* ¶ 25. Gold is traded in both physical form and in paper form through derivatives. *Id.* One aspect of this trade is gold leasing, in which central banks gain a return on their gold reserves by "lending" the gold to bullion banks, generally at very low interest rates. *Id.* ¶ 27. Bullion banks, the plaintiff alleges, use this "gold carry trade" to fund other investments by selling the borrowed gold and investing the proceeds. *Id.* The obligation to repay the leased gold to the central banks puts the bullion banks in a "short" physical position. *Id.*

The price of gold reached a high of $850 per ounce in 1980. SALE OF UK GOLD RESERVES 2. Over the past twenty years, the price has generally declined. *Id.* Since the end of 1997, gold has generally traded at between $250 and $300 per ounce. Compl. at 20.

The plaintiff alleges that the defendants have conspired since 1994 to manipulate the price of gold. He asserts that:

> This manipulative scheme appears directed at three objectives: (1) to prevent rising gold prices from sounding a warning on U.S. inflation; (2) to prevent rising gold prices from signaling weakness in the international value of the dollar; and (3) to prevent banks and others who have funded themselves by borrowing gold at low interest rates and are thus short physical gold from suffering huge losses as a consequence of rising gold prices.

*Id.* ¶ 34.

The plaintiff asserts that the defendants have attempted to further these aims by periodically selling or leasing large quantities of gold in order to depress its price. He claims, for example, that "surges in outflows [of foreign earmarked gold] from the N.Y. Fed coincided with periods of strength in gold prices," *id.* ¶ 40, and that "Goldman, Chase and Deutsche Bank have regularly appeared as heavy sellers of gold on the COMEX whenever necessary to kill any significant rally," *id.* ¶ 45. The plaintiff also provides data on what he calls "waves of preemptive selling," days on which "the COMEX closing price [fell] by more than three times the decline in the London PM fix from the AM fix on the same day." *Id.* ¶ 46. He alleges that "[a]lthough defined solely on a statistical basis, each period of extreme preemptive selling coincides with a period when gold prices displayed marked weakness in circumstances where historical trading patterns called for just the opposite behavior." *Id.* ¶ 47.

The plaintiff identifies "discrepancies between the [Federal Reserve System's] gold certificate account" and the total U.S. gold stock, which includes the gold held by the Exchange Stabilization Fund (ESF).[4] *Id.* ¶ 65. He interprets these discrepancies as strong evidence of "losses on gold trading." *Id.* He also documents the size of, and changes in, the total gold derivative holdings of Chase, Morgan and Citibank. *Id.* ¶ 57.

The plaintiff also identifies two supposedly incriminating statements, one made by a third party about one of the defendants and the other by a defendant himself. First, the plaintiff states that "ac-

---

4. The ESF is a fund created by Congress, which, "[s]ubject to approval by the President, ... is under the exclusive control of the Secretary" of the Treasury. 31 U.S.C. § 5302(a)(2). The fund was originally established in 1934 with a $2 billion appropriation. Gold Reserve Act of 1934, § 10(b), 48 Stat. 337, 341–42 (1934). The original purpose of the ESF was to "stabiliz[e] the exchange value of the dollar." *Id.*, § 10(a), 48 Stat. at 341. To this end, Congress authorized the Secretary to "deal in gold, foreign exchange, and other instruments of credit and securities the Secretary considers necessary," a power he retains to this day. 31 U.S.C. § 5302(b).

cording to reliable reports received by the plaintiff," Edward A.J. George, Governor of the Bank of England and a director of the BIS, stated that, upon a rise in the price of gold in 1999 in the wake of an agreement by fifteen European central banks to limit their gold sales:

> We looked into the abyss if the gold price rose further. A further rise would have taken down one or several trading houses, which might have taken down all the rest in their wake. Therefore at any price, at any cost, the central banks had to quell the gold price, manage it. It was very difficult to get the gold price under control but we have now succeeded. The U.S. Fed was very active in getting the gold price down. So was the U.K.

*Id.* ¶ 55. Second, the plaintiff selectively quotes from the testimony of Greenspan before the House Banking Committee in July 1998. *Id.* ¶ 38. The statement in full is: [5]

> To be sure, there are a limited number of OTC derivative contracts that apply to nonfinancial underlying assets. There is a significant business in oil-based derivatives, for example. But unlike farm crops, especially near the end of a crop season, private counterparties in oil contracts have virtually no ability to restrict worldwide supply of this commodity. Even OPEC has been less than successful over the years. *Nor can private counterparties restrict supplies of gold, another commodity whose derivatives are often traded over-the-counter, where central banks stand ready to lease gold in increasing quantities should the price rise.*

**5.** *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996) ("In deciding a motion to dismiss a securities action, a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.").

Greenspan Motion, Ex. E (Declaration of Robert de V. Frierson) (Letter from Greenspan to Senator Joseph I. Lieberman) (Jan. 19, 2000) (portion quoted in complaint in italics).

## B. The BIS Mandatory Share Redemption

The plaintiff was also, until January 8, 2001, a shareholder in the BIS. The BIS, which the plaintiff describes as "the central banks' central bank," Compl. ¶ 4, was created by treaty on January 20, 1930. *See* Convention Respecting the Bank for International Settlements, Jan. 20, 1930, 104 L.N.T.S. 441. The Statutes of the BIS describe the purposes of the BIS as follows: "to promote the co-operation of central banks and to provide additional facilities for international financial operations; and to act as trustee or agent in regard to international financial settlements entrusted to it under agreements with the parties concerned." Statutes of the Bank for International Settlements (hereinafter "BIS Statutes"), Art. 3, *available at* http://www.bis.org/about/statut.pdf (text as amended on January 8, 2001).

Most of the shares of the BIS have always been held by central banks, but a small proportion were privately sold at the time the BIS was founded. Compl. ¶¶ 4, 68. Private shareholders of the BIS, however, did not possess the same rights as typical owners of the stock of an American corporation. Under the BIS Statutes, the BIS could "decline to accept any person or corporation as a transferee of a share." BIS Statutes, Art. 12. Furthermore, private shareholders had no voting rights or rights of representation at the annual meeting of the BIS. *Id.*, Art. 14.

On September 15, 2000, the BIS sent a "Note to Private Shareholders" indicating that the BIS planned "to vote at a meeting on January 8, 2001, to compel all private holders ... to surrender their shares against a payment" of 16,000 Swiss francs per share. *Id.* [6]

The plaintiff challenges the adequacy of the payment offered for the shares. He asserts that the price is less than half the per share net asset value of the BIS, as determined by J.P. Morgan & Cie SA, a French subsidiary of defendant Morgan Chase. Compl. ¶ 67. The plaintiff also argues that the justifications offered by the BIS for the lower price—that private shareholders did not have voting rights and that the shares had low liquidity—are insufficient. *Id.* ¶¶ 71–72.

### III. Procedural Posture of Case

At oral argument on the present motions, I dismissed, without prejudice, all counts against the BIS for insufficiency of service of process and, with prejudice, counts 2 and 3 (alleging respectively securities fraud and common law fraud and breach of fiduciary duty) against Morgan Chase for the failure to state a claim. The plaintiff has subsequently served the BIS in a satisfactory manner, and the BIS and the plaintiff have jointly moved that I resolve the remaining arguments for dismissal of this action made by the BIS in its motion to dismiss.

### IV. Analysis

I divide my discussion of the issues raised by the complaint into four main sections: one for each of the four counts.

### A. Count 1: Sherman Act Violations

■ The plaintiff's first count alleges that all of the defendants have violated Section 1 of the Sherman Act by conspiring to depress the price of gold. *See* 15 U.S.C. § 1 (declaring "[e]very ... conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, ... to be illegal"); *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, *depressing*, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.") (emphasis added). The plaintiff asserts a cause of action for these violations under sections 4 and 16 of the Clayton Act, which allow private individuals to sue for damages and injunctive relief. 15 U.S.C. § 15(a) (section 4); 15 U.S.C. § 26 (section 16).[7]

The defendants argue that the plaintiff lacks standing to raise this antitrust claim and that he has failed to allege sufficient facts to make out a claim. Greenspan, McDonough,[8] and the Secretary of the

---

**6.** The parties agree that subsequent to the filing of the complaint, "[o]n January 8, 2001, an Extraordinary General Meeting (EGM) of the BIS unanimously approved the mandatory redemption transaction. As of that date ... the registrations of all privately held shares were cancelled on the books of the BIS and replaced by a statutory right to payment...." BIS Mot. at 6.

**7.** Section 4 provides for threefold damages: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the dam-

ages by him sustained...." 15 U.S.C. § 15(a). Section 16 permits injunctive relief: "Any person ... shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26.

**8.** McDonough also argues that this court lacks jurisdiction over his person. In view of my disposition of the present motions, I do not need to reach the personal jurisdiction issue.

Treasury also argue that they are protected from suit by virtue of the sovereign immunity of the United States. The plaintiff contends that count 1 should not be dismissed on any of these grounds.

I hold that the plaintiff lacks antitrust standing. Because of my conclusion on the standing question, I need not consider the defendants' arguments that the plaintiff has failed to state a claim under the Sherman Act. Although my conclusion on the standing question is a sufficient basis on which to dismiss count 1 of the complaint, I nevertheless examine the sovereign immunity arguments of Greenspan, the Secretary, and McDonough, because these arguments are also relevant to other counts. I conclude that sovereign immunity bars suit against these defendants, and thus provides an independent ground on which to dismiss count 1 as to them.

### 1. Standing

A fundamental requirement in any case is that the plaintiff have standing to bring the suit. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Standing has both constitutional and statutory dimensions. The defendants here do not contest that Howe can satisfy the constitutional test of injury-in-fact, causation, and redressability. *See id.* at 560–61, 112 S.Ct. 2130. Instead, they claim that the plaintiff cannot meet the stricter, judicially-developed test for "antitrust standing."

■ The Supreme Court has established a set of factors for courts to consider in deciding whether a plaintiff has standing to bring an antitrust claim.

These factors are: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws

("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*Sullivan v. Tagliabue,* 25 F.3d 43, 46 (1st Cir.1994) (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Although the factors to be used are clear, the precise manner by which they are to be weighed is less so. *See Sullivan,* 25 F.3d at 46 (*"Associated General Contractors* ... gives little guidance as to how to weigh the various factors, and whether the absence of a particular factor would be fatal to standing in every instance.").

■ The First Circuit has adopted a balancing approach, in which that court has "emphasized the causation requirements." *RSA Media, Inc. v. AK Media Group, Inc.,* 260 F.3d 10, 14 (1st Cir.2001). The first and fourth factors explicitly call for a causation inquiry. Furthermore, the Supreme Court's definition of " 'antitrust injury' as 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful' " also implies that there must be a causal connection between the defendants' violation and the plaintiff's injury. *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Thus the third of the factors set out in *Associated General Contractors* also requires an inquiry into causation. Indeed, among the three "causation" factors, the third—"antitrust injury"—is preeminent; even if antitrust injury is not sufficient to provide standing, it is usually necessary. *See id.* ("Even when a causal link has been established between the alleged viola-

tion and the injury, the absence of 'antitrust injury' will generally defeat standing.").

Howe asserts that he has been injured by the alleged conspiracy because he is (or was, in the case of the redeemed BIS stock) the holder of six BIS shares and 1200 shares of Gold–Denominated Preferred Stock, Series II in Freeport–McMoran Copper & Gold, Inc. Compl. ¶ 2. He argues that his ownership of these shares provides him with standing because the value of his shares is closely tied to the price of gold. Specifically, he alleges that the BIS has always used the gold franc as its unit of account, id. ¶ 69, and that the BIS "holds approximately 200 metric tonnes of gold for its own account", id. ¶ 4, while the Freeport–McMoran preferred stock pays dividends in, and will be redeemed for, the cash equivalent of a given quantity of gold, id. ¶ 14. He asserts, therefore, that conspiratorial actions which depress the price of gold reduce the value of his shares.

The defendants focus on the question of antitrust injury in their challenge to Howe's standing to bring his antitrust claim. The defendants argue that Howe is neither a consumer nor a competitor in the market for gold, see Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."), and that Howe's alleged injuries are only indirect and derivative. The defendants also point to many cases (though none in the First Circuit) that have held that shareholders lack standing to sue for antitrust injury to the corporation whose stock they hold. See II PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 353d, at p. 439 (2d ed.2000) (hereinafter "AREEDA & HOVENKAMP") ("[T]he same reasons of policy that prevent a shareholder from obtaining direct redress from those with contractual or tort liability to the corporation should also prevent him from obtaining direct redress from those with antitrust liability to the corporation.").

The plaintiff responds that he sues not as a common shareholder, but rather as the holder of "two different securities linked directly and with arithmetic precision to the price of gold." Consolidated Opp'n at 40. He argues that this case is analogous not to the shareholder cases, but to cases in which participants in the cash market for a commodity have sued for antitrust violations in the futures market for the same commodity. Id. at 40–41. Howe cites two such cases, Sanner v. Board of Trade of City of Chicago, 62 F.3d 918 (7th Cir.1995), and In re Copper Antitrust Litigation, 98 F.Supp.2d 1039 (W.D.Wis.2000), both of which held that participants in the cash market did have standing. He argues that just as manipulation of the futures market has a direct impact on the cash price of a commodity, so "[a]ny manipulation of gold prices necessarily affects the value of payments under [the BIS and Freeport–McMoran] securities in the same manner and to the same extent as it affects purchases and sales of bullion." Consolidated Opp'n at 41.

Goldman Sachs and Deutsche Bank, in their joint reply ("Goldman/DB Reply"), contest this characterization. They argue that the futures market and the cash market in a given commodity are essentially a single market, "[b]ecause futures contracts [a]re agreements to execute cash transactions at a specified time." Goldman/DB Reply at 3. In contrast, they argue, the plaintiff has suffered only "virtual injury arising notionally from effective transactions in gold." Id. at 2. In other words, the argument goes, the plaintiff did not

participate in the gold market; rather, he participated in another market in which values were merely expressed as the equivalents of particular quantities of gold. To illustrate the consequences of granting the plaintiff standing in such a case, these defendants present a parade of horribles:

> On the plaintiff's theory, any mortgagor whose adjustable rate note is "tied" notionally to Treasury note interest rates could sue for "manipulation" in the government securities market. A commercial borrower whose revolving loan is based on a [London Interbank Offered Rate] spread could allege "price fixing" by the London banks. A holder of a market "index" could sue for price movements of constituent investments in the index "basket." In short, any stranger to a market that is party to a contract providing for the exchange of value nominally associated with some value in that market would be a suitable antitrust plaintiff. The possibilities are endless, and staggering.

*Id.* at 3–4.

Neither the common shareholder nor the futures market / cash market cases compel a particular result in this case, because the plaintiff's situation does not match precisely either of those scenarios. Although the arithmetic relationship between a reduction in the price of gold and the value of the plaintiff's securities is transparent, (as is the relationship between the futures and cash markets), that arithmetic relationship is still mediated through the plaintiff's connection, as shareholder, with the entities whose securities he owns (or owned). Therefore his involvement in the gold market seems no more direct than that of any other shareholder. Yet the injury of which Howe complains is different in kind from that of an ordinary shareholder, in that he does not allege that his injury is derivative of an injury to the corporation. He does not complain that Freeport–McMoran has

been harmed by the alleged conspiracy (though, as a gold mining company, it presumably would be). He alleges only that he has been injured: the value of his securities has been depressed by the alleged conspiracy to depress the price of gold. *Cf.* II AREEDA & HOVENKAMP, ¶ 353d, at p. 440 ("Of course, shareholders have standing to challenge antitrust violations that injure them directly rather than derivatively. Thus shareholders may challenge an illegal conspiracy to depress share prices by conduct not injuring the corporation.").

In the end, however, the defendants' arguments are persuasive. To grant standing to a plaintiff whose injury is only notionally related to a commodity's price would be to ignore the general restriction of antitrust standing to those with direct injuries. This conclusion seems particularly sound when, as here, there are many participants in the gold and gold derivatives markets who could allege a more direct injury than does the plaintiff. For example, there are many gold mining companies and private investors in gold (not to mention those central banks with gold reserves) that the plaintiff does not allege to be involved in the conspiracy. All of these persons or entities would be more directly injured than the plaintiff by a scheme of the kind he alleges.

█ Indeed, it is the existence of such alternative and more appropriate plaintiffs that defeats the plaintiff's argument that he should be granted standing under the First Circuit's exception for the standing of "second-best" plaintiffs. Because antitrust standing "involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws," *Serpa*, 199 F.3d at 10 (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991)), and antitrust standing "is restricted ... to avoid over-

deterrence," *id.*, the First Circuit has softened the harsher edges of antitrust standing by stating that "there may be some instances where presumptively disfavored plaintiffs do have standing to bring an antitrust action," *Id.* at 12. But "[t]he most obvious reason for conferring standing on a second-best plaintiff is that, in some category of cases, there may be no first best plaintiff with the incentive or ability to sue." *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 45 (1st Cir.1995).

The plaintiff, in effect, alleges that this is such a case. Specifically, in his surreply, Howe argues that I should determine that he has standing because, "as a practical matter and due to the government's own conduct, few potential plaintiffs are available to enforce the Sherman Act against the public officials and bullion banks manipulating gold prices." Pl.'s Opp'n to Mots. of Morgan Chase, Goldman Sachs and Deutsche Bank for Leave To File Reply Memoranda in Support of their Mots. to Dismiss ("Sur–Reply") at 3. He asserts, first, that the Department of Justice, in defending O'Neill and Summers, in this case, has shown that it will not pursue an enforcement action; and, second, that the concentration of the gold banking business in a small number of banks means that "most gold mining companies cannot bring claims of price fixing in the gold market without naming as defendants one or more of the bullion banks on their credit lines and/or hedging facilities." *Id.* at 4.

These arguments do not persuade me that the plaintiff should be granted standing as a second-best plaintiff. As an initial matter, the use of the conditional tense in the two First Circuit opinions quoted above is no coincidence: neither *Serpa* nor *SAS* found that the plaintiff satisfied the test for applying the doctrine of second-best plaintiff. Furthermore, neither case

mentions the lack of a government enforcement suit as a relevant factor.

As for the lack of private plaintiffs, there seem to be at least as many potential plaintiffs here as there were in those two cases. *SAS* spoke in a conclusory fashion of "various potential plaintiffs ... who should have ample incentive and ability to challenge violations that foreclose their access to customers." 48 F.3d at 45. *Serpa* provided a more detailed discussion of the issue, but still concluded that both consumers, who faced a seven-percent increase in the cost of major plumbing components, and competitors, when the defendants controlled fifteen percent of the market, had "ample incentive to bring an antitrust claim." 199 F.3d at 12–13. Under this standard, it seems clear that there is sufficient incentive for any of the many gold mining companies or private investors in gold or gold derivatives to bring suit.

I therefore conclude that the plaintiff lacks standing to bring a claim under the Clayton Act. As I have noted earlier, while this conclusion is sufficient to dismiss count 1 as to all defendants, I will also consider the argument that the defendants who are government officials are immune from suit.

### 2. Sovereign and Official Immunity

Three of the defendants named in count 1 are government officers. Howe states that he has sued Greenspan, McDonough, and the Secretary of the Treasury in both their official and individual capacities. To the extent that this is an official-capacity suit, Secretary O'Neill is a government defendant; Summers remains a defendant in his personal capacity.

A suit against federal government officers in their official capacities is in effect a suit against the government entity which the officer heads or to which the officer belongs. *Kentucky v. Graham,*

473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *American Policyholders Insurance Co. v. Nyacol Prods. Inc.*, 989 F.2d 1256, 1259 (1st Cir.1993), *cert. denied*, 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994). Any judgment from such a suit is binding on the entity and not on the officer personally. *Graham*, 473 U.S. at 166, 105 S.Ct. 3099; *American Policyholders*, 989 F.2d at 1259. Therefore, if a suit against the entity would be barred by sovereign immunity, so too will an official-capacity suit. A personal-capacity suit, by contrast, seeks to impose personal liability on the officer. As such, the officer is not protected by the federal government's sovereign immunity. *Id.*

 Regardless of the manner by which a plaintiff designates the action, a suit should be regarded as an official-capacity suit, subject to the defense of sovereign immunity, when a "judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (internal quotation marks and citations omitted); *accord Coggeshall Development Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir.1989). To the extent that Howe seeks specific relief, his suit must be regarded as one against the defendants in their official capacities. Greenspan, McDonough, and the Secretary of the Treasury could not have participated in the alleged conspiracy as individuals. Quite to the contrary, Howe alleges that these defendants participated in the conspiracy through their control of the Federal Reserve System and the ESF. *See, e.g.,* Compl. ¶ 62. To the extent that any of these defendants "controls" the Federal Reserve System or the ESF, he does so by virtue of his official position. Therefore, any injunction that could result from this suit would necessarily run against the defendants in their official capacities and "restrain the Government from acting, or ... compel it to act." *Dugan,* 372 U.S. at 620, 83 S.Ct. 999.

 To the extent then that Howe has sued the government defendants in their official capacities, I must consider whether the suit is barred by the sovereign immunity of the United States. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Through a series of statutes, however, Congress has waived the sovereign immunity of the United States in some contexts. A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Coggeshall,* 884 F.2d at 3. "General jurisdictional statutes such as 28 U.S.C. § 1340 do not waive sovereign immunity and therefore cannot be the basis for jurisdiction over a civil action against the federal government." *Berman v. United States,* 264 F.3d 16, 20 (1st Cir.2001).

The plaintiff claims that Congress, in the Administrative Procedure Act ("APA"), has broadly waived the sovereign immunity of the United States. Section 702 of the APA, 5 U.S.C. § 702, does waive the sovereign immunity of the United States, with some exceptions, in suits "seeking relief other than monetary damages" against federal agencies and officers. The defendants argue that the present suit is not cognizable under section 702 because the defendants carried out no "agency action," *id.,* because the statutes under which they acted "preclude judicial review," *id.* § 701(a)(1), and because their actions were "committed to agency discretion by law," *id.* § 701(a)(2). I need not consider these arguments, however, because even if Section 702 constitutes a waiver of sovereign

immunity in this case, the plaintiff still cannot assert a claim against government officers under the Sherman Act.

█ The United States, its agencies, and its officials acting in their official capacity are not "persons" within the meaning of the Sherman Act. Though neither the Supreme Court[9] nor the First Circuit[10] has ever ruled directly on the issue, the circuit courts that have faced the question have been unanimous in holding that agencies, instrumentalities, and officers of the federal government cannot be sued under the antitrust laws. *See, e.g., Name. Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 581 (2d Cir.2000) (National Science Foundation); *Sakamoto v. Duty Free Shoppers, Ltd.*, 764 F.2d 1285, 1289 (9th Cir.1985) (Guam), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1457, 89 L.Ed.2d 715 (1986); *Jet Courier*, 713 F.2d at 1228 (Federal Reserve Banks); *Sea–Land*, 659 F.2d at 246 (federally chartered railroad).

█ The reasoning of these cases is persuasive. As the *Sea–Land* court put it: "The *Cooper Corp.* Court apparently assumed the United States was not exposed to liability under the Sherman Act, subse-

quent case law is consistent with that view, [and] Congress had a clear occasion to address the issue in 1955 but failed to do so." *Sea–Land*, 659 F.2d at 246. The reach of the antitrust laws is a policy judgment. Thus when there is no evidence that Congress intended to subject federal government agencies, officials, and instrumentalities to the antitrust laws—indeed, when all evidence points in the opposite direction—it is inappropriate for a court to infer such an intent. *See id.* at 247. Accordingly, I hold that Greenspan, McDonough, and Summers are not "persons" under the antitrust laws, at least to the extent they acted in their official capacities.

█ The plaintiff argues that he may still sue Greenspan, McDonough, and Summers in their official capacities for specific relief under the *Larson* ultra vires exception to sovereign immunity. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Under this doctrine, "[t]he prohibition on suits against the United States does not apply in suits where the plaintiffs sue for specific relief against fed-

---

9. While not ruling on this specific issue, a Supreme Court decision formed the basis for the seminal *Sea–Land* decision. *See Sea–Land Service, Inc. v. Alaska Railroad*, 659 F.2d 243, 246 (D.C.Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). In *United States v. Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), the Court held that the United States was not a "person" under the provision that allowed an injured person to sue for treble damages under the antitrust laws, noting that if the United States qualified as a person under this provision, then it would also be a "person" subject to Sherman Act liability. *Id.* at 606, 61 S.Ct. 742. In 1955, Congress amended the Clayton Act to authorize suits by the United States for actual, but not treble, damages under the antitrust laws. Pub.L. No. 84–137, 69 Stat. 282 (1955); *see Sea–Land*, 659 F.2d at 245. Congress did not, however, amend the definition of "person" under the Sherman Act to

include the United States. *See Sea–Land*, 659 F.2d at 246–47 ("Congress had a clear occasion to address the issue in 1955 but failed to do so.... We believe a court should not infer such a judgment from the silence of Congress.").

10. Although the First Circuit has not considered whether federal agencies or officers fall within the definition of "persons" in the antitrust laws, one case, cited in *Jet Courier Services v. Federal Reserve Bank of Atlanta*, 713 F.2d 1221, 1228 (6th Cir.1983), suggests that the First Circuit would agree with the other circuits at least as concerns the Federal Reserve Bank. *See Federal Reserve Bank of Boston v. Commissioner of Corporations and Taxation*, 499 F.2d 60, 62 (1st Cir.1974) ("[F]ederal reserve banks ... are plainly and predominantly fiscal arms of the federal government. Their interests seem indistinguishable from those of the sovereign.").

eral officers, alleging either (1) that the officers have acted beyond their statutory authority or (2) that the statute conferring power upon the officers is unconstitutional." *Kozera v. Spirito,* 723 F.2d 1003, 1008 (1st Cir.1983).

 This claim of the plaintiff fails for two reasons. First, to qualify for the ultra vires exception, the plaintiff must assert a viable cause of action. Typically, such a cause of action would come from a source of law— such as state common law or the federal constitution— that does not specify who is subject to it or that explicitly applies to government action. *See, e.g., Dugan,* 372 U.S. at 617, 83 S.Ct. 999 (trespass and constitutional claims); *Larson,* 337 U.S. at 684, 69 S.Ct. 1457 (breach of contract claim). As I have outlined above, the Sherman Act does not provide a cause of action against government officers.

Second, even if I assume that the plaintiff states a viable cause of action, this case does not meet the requirements of the *Larson* test itself. The plaintiff does not allege that the defendants were acting under an unconstitutional statute, and therefore he must demonstrate that they acted beyond their statutory authority.

 To claim that a defendant acted beyond his statutory authority, the plaintiff must assert "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient." *Larson,* 337 U.S. at 690, 69 S.Ct. 1457. An official "may be said to act ultra vires only when he acts without any authority whatever." *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 79 L.Ed.2d 67 (internal quotation marks and citations omitted).[11]

Both federal reserve officials and the Secretary of the Treasury have statutory bases for their authority to trade in gold. *See* 12 U.S.C. § 354 ("Every federal reserve bank shall have power to deal in gold coin and bullion at home or abroad, to make loans thereon, exchange Federal reserve notes for gold, gold coin, or gold certificates, and to contract for loans of gold coin or bullion, giving therefor, when necessary, acceptable security...."); 31 U.S.C. § 5302 (granting the ESF authority to "deal in gold, foreign exchange, and other instruments of credit and securities"). Thus, even if one accepts as true the plaintiff's allegations of wrongdoing, Greenspan, McDonough, and the Secretary of the Treasury have not acted "without any authority whatever."

For all the reasons set forth above, I conclude that Greenspan, McDonough and the Secretary of the Treasury in their official capacities are not "persons" within the meaning of the antitrust laws. They enjoy the protection of sovereign immunity.

 Government officials sued for damages in their individual capacities are not protected by sovereign immunity. *See Clark v. Library of Congress,* 750 F.2d 89, 103 (D.C.Cir.1984) ("If a plaintiff seeks to recover damages from a defendant in his personal, individual capacity then there is no sovereign immunity bar."). Nevertheless, the plaintiff's claims against them may not go forward.

 Even if I assume that this suit is genuinely against Greenspan, McDonough, and the Secretary as individuals, I conclude that their conduct was protected by their qualified immunity as executive officials. This immunity shields "govern-

---

11. The *Pennhurst* case dealt with the scope of Eleventh Amendment immunity of state officials, but the ultra vires analysis is the same in this context. *See Kozera,* 723 F.2d at 1008 n. 4.

ment officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *accord Gardner v. Vespia,* 252 F.3d 500, 502 (1st Cir.2001). To the extent that the plaintiff alleges that the defendants violated the Sherman Act, it is clear that "a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct." *Singer v. Maine,* 49 F.3d 837, 844 (1st Cir.1995) (citations and internal quotation marks omitted). All of the relevant case law, as discussed above, indicates that government officials are not subject to the Sherman Act, and both the Federal Reserve and the ESF have statutory authority to trade in gold.

Accordingly, for the reason that Greenspan, McDonough, and the Secretary of the Treasury are protected from suit by the doctrine of qualified immunity and for the reasons set out above, I dismiss count 1 with respect to them.

## B. Count 2: 1934 Securities Exchange Act Violations

The plaintiff alleges that the BIS defendants (Greenspan, McDonough, Morgan Chase, and the BIS) have violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"). As noted earlier, at the hearing on the defendants' motions, I dismissed all counts against the BIS without prejudice and counts 2 and 3 against Morgan Chase with prejudice. The matter that dictated dismissal of the BIS— insufficiency of service of process— has been cured.

Therefore, at this stage of the case, only the BIS, Greenspan and McDonough remain as defendants to count 2.

The defendants now named in count 2 argue that they are immune from suit under the Exchange Act; that the plaintiff's Exchange Act claims are insufficient as a matter of law, because, among other reasons, those claims do not include allegations of reliance and causation; and that the claims are subject to compulsory arbitration. Because I find the first two arguments each provide independent grounds to dismiss count 2, I do not address the arbitration argument.

The plaintiff alleges securities fraud in the mandatory redemption by the BIS of its shares from private shareholders. Specifically, Howe charges that "[t]he BIS defendants [now only the BIS, Greenspan and McDonough] have knowingly and intentionally failed to disclose material facts, and knowingly and intentionally made false and misleading statements of material facts, with respect to the manipulation of gold prices," Compl. ¶ 89, and "with respect to other matters relevant to the proposed freeze-out of the BIS's private shareholders," *id.* ¶ 91. "The plaintiff alleges that what should have been his voluntary investment decision—to tender or not based on his evaluation of the fairness of the offer—was taken from him without legal authority and under false pretenses...." Consolidated Opp'n at 49. He sues Greenspan and McDonough in their capacities as members of the board of directors of the BIS.

Section 10 of the Exchange Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or any facility of any national securities exchange ...
(b) To use or employ, in connection with

the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b–5, promulgated by the SEC, provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange: (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Howe argues that the defendants have violated all three clauses of Rule 10b–5. Consolidated Opp'n at 45–46. Specifically, he argues that "the freeze-out transaction involved four principal artifices to defraud the BIS's private shareholders" that violated clauses (a) and (c). *Id.* at 45. The first was to base the redemption price on the artificially low price of gold produced by the alleged gold price-fixing conspiracy. *Id.* The second was to set the redemption price in Swiss francs rather than gold francs, "the BIS's regular and required unit of account." *Id.* The third was to carry out the mandatory share redemption at all, a procedure that Howe alleges was "not authorized under the Convention or the Constituent Charter" and was used "to

disguise what amounted to an effective liquidation of the original BIS and its reorganization to a new purpose." *Id.* at 46. The fourth was to conceal "an underlying intent to transfer the American issue at the freeze-out price to the Federal Reserve, thereby making the United States a full shareholding member of the BIS." *Id.*

The plaintiff also asserts that the defendants have violated clause (b) by making misleading statements and omissions as to material facts. Compl. ¶¶ 89, 91; Consolidated Opp'n at 46–47, 50. He argues that "[t]he assertion that the BIS could freeze-out its private shareholders merely by amending its Statutes constituted a misrepresentation of its powers" and "was a brazen attempt to trick shareholders, not into making a voluntary tender, but into accepting an illegal seizure of their shares at an inadequate price." Consolidated Opp'n at 46–47. Howe further asserts that the existence of the defendants' plan to transfer the former privately held shares of "the American issue" to the Federal Reserve was a fact that, "if disclosed to shareholders, would have affected not just their decision whether to litigate the transaction but also the forums and remedies available to them." *Id.* at 47. Finally, Howe disputes the justification given in the BIS's "Note to Private Shareholders" for setting the mandatory share redemption price at less than the per share net asset value as determined by a valuation opinion of J.P. Morgan & Sie SA, namely that the shares had low liquidity and no voting rights. Compl. ¶¶ 67–72.

*1. Immunity From Suit*

I first consider Greenspan's and McDonough's argument that they are immune from suit under the Exchange Act. Government officers acting in their official capacities are excluded explicitly from the reach of section 10(b) of the Exchange Act:

No provision of this chapter shall apply to, or be deemed to include, any executive department or independent establishment of the United States, or any lending agency which is wholly owned, directly or indirectly, by the United States, or any officer, agent, or employee of any such department, establishment, or agency, acting in the course of his official duty as such, unless such provision makes specific reference to such department, establishment, or agency.

15 U.S.C. § 78c(c). This provision seems directly applicable to Federal Reserve officials acting in their official capacities. Perhaps because of the clarity of the statutory text, the case law interpreting it is quite thin. Nevertheless, the cases are unanimous that government officials are immune from Exchange Act claims. *See, e.g., OKC Corp. v. Williams,* 461 F.Supp. 540, 549 (N.D.Tex.1978) (holding that officers and employees of the SEC were exempt from liability under the Exchange Act); *Colonial Bank & Trust Co. v. American Bankshares Corp.,* 439 F.Supp. 797, 802 (E.D.Wis.1977) ("While no case authority has been cited by any of the parties and the Court has found none, the clear language of [15 U.S.C. § 78c(c) ] makes it applicable to the FDIC.... It is not subject to the federal securities laws, nor are its officers or agents."). Accordingly, Greenspan and McDonough are immune from suit under the Exchange Act.

As with Count 1, the *Larson* exception is inapplicable here. The Exchange Act does not provide a cause of action against government officers. Moreover, as the plaintiff himself states, Greenspan and McDonough served as members of the board of the BIS "as ... federal official[s] appointed by vote of the Federal Reserve Board ... acting pursuant to authority received from both the Secretary of the Treasury and the Secretary of State ... to assist in carrying out the President's foreign poli-

cy...." Consolidated Opp'n at 24. Therefore, the plaintiff cannot claim that the government officials were acting "without any authority whatever." *Pennhurst,* 465 U.S. at 101 n. 11, 104 S.Ct. 900. Moreover, even if the plaintiff could maintain an individual-capacity suit for damages, Greenspan and McDonough would be protected by their qualified immunity, "as their conduct [on the BIS board] d[id] not violate any clearly established statutory or constitutional rights." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727.

### 2. Sufficiency of the Allegations

■ The specific immunity from Exchange Act claims granted by the Act itself is a sufficient ground to dismiss this count as to Greenspan and McDonough. There is another ground, however, that compels dismissal not only as to those defendants, but also as to the BIS. Howe cannot establish the basic requirements of a 10b–5 claim because the mandatory share redemption could be—and was—carried out without the approval or participation of the private shareholders of the BIS. Therefore, at a minimum, Howe cannot demonstrate either causation or reliance.

The most critical flaw in the plaintiff's allegations is that he does not allege that he made any investment decision that was affected by either any statement by the defendants or by any artifice to defraud. Therefore he is unable to satisfy the reliance and causation requirements of a Rule 10b–5 claim.

Section 10(b) prohibits the use of "manipulative or deceptive device[s]" only "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Here, the plaintiff purchased his BIS shares in 1989. Not only did this transaction long predate any of the alleged fraudulent conduct, but the statute of limitations on any claim aris-

ing out of this transaction has long expired. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (establishing a limitations period for Rule 10b–5 claims of "one year after the discovery of the facts constituting the violation and ... three years after such violation"). Therefore, the only "purchase or sale" to which the plaintiff can turn is the mandatory share redemption, which was consummated on January 8, 2001. The problem, of course, is that the plaintiff had no choice in the matter. The decision to carry out the mandatory share redemption could be, and was, made without the consent of the private shareholders, who had no voting rights. Once the BIS adopted this plan, the former private shareholders' only right under the BIS Statutes was to receive cash payments. At neither stage of this process did the private shareholders have any investment decision to make. Therefore, even with the most herculean semantic stretch one cannot describe the private shareholders as having been "manipulat[ed]" or "dece[ived]."

To avoid the inescapable conclusion of this line of reasoning, the plaintiff points to *Securities and Exchange Commission v. Parklane Hosiery Co.,* 558 F.2d 1083 (2d Cir.1977). In that case, the court, while appearing to rely predominantly on section 14(a) of the Exchange Act rather than section 10(b), held that a short-form merger carried out without the involvement of the minority shareholders could still constitute a violation of the securities laws. The court held that the defendants' failures to disclose information were relevant because the minority shareholders may have been able to enjoin the merger under New York corporate law. *Id.* at 1088.

*Parklane Hosiery* is one in a line of cases espousing what has been called the "forced-seller" or "fundamental change" doctrine. The seminal case is *Vine v. Bene-*

*ficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). There, as in *Parklane Hosiery,* a minority shareholder squeezed out in a short-form merger was allowed to bring suit under section 10(b). *Id.* at 634–35. The plaintiff, a Class B shareholder, alleged that the defendant's fraud had induced the Class A shareholders to vote in favor of the transaction. Under these circumstances, the court held, the plaintiff need not show reliance "when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer." *Id.* at 635. The "fundamental change" variant of the doctrine was developed in *Rathborne v. Rathborne,* 683 F.2d 914 (5th Cir.1982), which held that a minority shareholder could not sue under Rule 10b–5 for an allegedly fraudulent corporate reorganization because he "was not subjected to the kind of fundamental change in the nature of his investment which is necessary to constitute a statutory purchase or sale," *id.* at 920.

The First Circuit has never addressed the validity of the "forced-seller" doctrine. However, four cases in this district have endorsed it to varying degrees. First, in *Feldberg v. O'Connell,* 338 F.Supp. 744 (D.Mass.1972), Judge Ford, citing *Vine,* held that "the conversion of plaintiffs' partnership interests through dissolution of the partnership into cash would clearly constitute a sale of a security within the meaning of Rule 10b–5." *Id.* at 746. In that case the plaintiffs contended that if the partnership's auditors had not certified financial statements that contained untrue statements, they would have dissolved the partnership earlier than its actual dissolution. *Id.* at 745.

The second case is *Arnesen v. Shawmut County Bank, N.A.,* 504 F.Supp. 1077 (D.Mass.1980), in which the plaintiff stockholders alleged that their shares had be-

come worthless due to a fraudulent scheme that involved orchestrating the corporation's default on a loan followed by the sale of all of the corporate assets, *id.* at 1081. Chief Judge Caffrey discussed the "forced-seller" doctrine, but decided that it was inapplicable to the facts of the case. *Id.* at 1081–82.

In the third case, *Fulco v. American Cable Systems of Florida*, Civ. A. No. 89–1342–S, 1989 WL 205356 (D.Mass. Oct.4, 1989), Judge Skinner endorsed the "forced-seller" doctrine, but also held that to plead causation and reliance adequately, the plaintiffs had to allege that the limited partners who voted in favor of the transaction at issue relied on the defendants' misleading statements. *Id.* at * 4.

Finally, in *Jacobs v. Winthrop Financial Associates*, 77 F.Supp.2d 206 (D.Mass. 1999), Chief Judge Young cited the three cases mentioned above, concluding that they "collectively articulate a sound and consistent application of the forced seller doctrine which guides the Court's decision here," *id.* at 209. He concluded that the cases established a narrow construction of the forced-seller doctrine, and that therefore the doctrine was "inapplicable to the case at bar" because the plaintiffs, limited partners, "retain[ed] their interest in an existing business." *Id.* at 210.

In the years since *Vine*, several Supreme Court decisions have undermined the premises upon which a broad reading of that decision is based. First, in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Court held that to sue under Rule 10b–5, a plaintiff must in fact have purchased or sold a security, and not merely plead that he refrained from purchasing or selling a security, because of the defendant's misrepresentations, *id.* at 755, 95 S.Ct. 1917. Then in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the

Court held that "a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure," does not violate section 10(b) or Rule 10b–5, *id.* at 476, 97 S.Ct. 1292. Finally, in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Court held that minority shareholders whose votes were not needed to authorize the relevant corporate action could not sue under section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9 for an allegedly misleading proxy statement, because they could not establish the causation element of the cause of action. *Id.* at 1087, 111 S.Ct. 2749.

Accordingly, in recent years, the opinions of some courts have cast doubt upon the continued viability of the forced-seller or fundamental change doctrines. For example, the Seventh Circuit has stated: "So the fundamental-change doctrine, successor to the defunct forced-seller doctrine, is inapplicable to this case. And anyway we very much doubt that the doctrine retains any validity in any class of case, even in squeeze-out cases." *Isquith v. Caremark International, Inc.*, 136 F.3d 531, 536 (7th Cir.), *cert. denied*, 525 U.S. 920, 119 S.Ct. 274, 142 L.Ed.2d 226 (1998). Even the Second Circuit, which created the forced seller doctrine in *Vine*, has severely limited its scope. In *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir.2000), *cert. denied*, 532 U.S. 923, 121 S.Ct. 1362, 149 L.Ed.2d 290 (2001), the court stated: "We reject plaintiffs' contention that '[w]here the misrepresentations and nondisclosures under Rule 10b–5 are part and parcel of the forced sale by the plaintiffs shareholders ..., there is no separate requirement to show causation.'" *Id.* at 48. The plaintiffs view, it held, was based on a misunderstanding of *Vine*:

We did not hold that the plaintiff was not required to plead reliance or causa-

tion; rather, we held that the complaint adequately pleaded both elements. Noting that the complaint alleged a single two-phase scheme to eliminate Class A shareholders, we stated that '[w]hat must be shown is that there was a deception which misled Class A stockholders and that this was in fact the cause of plaintiff's claimed injury. The allegations of this complaint meet that test.' *Id.* at 49 (citing *Vine*, 374 F.2d at 635).

It is at least doubtful, therefore, whether the forced-seller doctrine retains any viability. The First Circuit has never adopted it; the Second Circuit, which created it, has drastically cut it back; and the courts of this district, while professing to continue endorsing the doctrine, have construed it narrowly and have not found it satisfied in many years.

■■■ I need not decide, however, whether it would be appropriate to abandon the forced-seller doctrine altogether, for I conclude that, when properly construed, the doctrine is of no avail to the plaintiff here. The cases demonstrate two main contexts in which a plaintiff, who was not himself deceived into buying or selling his shares by misleading statements or a fraudulent scheme, can still sue under Rule 10b–5. The first is when some other shareholders or partners were deceived and the plaintiff's injury results from a transaction that the deceived shareholders or partners endorsed. *See, e.g., Grace*, 228 F.3d at 49; *Vine*, 374 F.2d at 635; *Fulco*, 1989 WL 205356 at * 4. Here none of the private shareholders had any power to prevent the mandatory share redemption, and therefore no alleged fraud played a role in the transaction. The second situation is when the plaintiff could have enjoined the transaction under the law of the state of incorporation, but was deceived into not taking that action because of the fraud. *See, e.g., Santa Fe*, 430 U.S. at 474 n. 14, 97 S.Ct. 1292; *Parklane Hosiery*

*Co.*, 558 F.2d at 1088. The BIS was not organized under the laws of any state of the United States; rather, it was created by international treaty. Therefore the plaintiff never had any right under any state law to enjoin a transaction as having no valid corporate purpose.

Thus, the plaintiff is unable to demonstrate either reliance or causation. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."); *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.) ("The plaintiff must show both. 'Loss causation' means the investor would not have suffered a loss if the facts were what he believed them to be; 'transaction causation' means that the investor would not have engaged in the transaction had the other party made truthful statements at the time required."), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988); *see also* 15 U.S.C. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). The plaintiff as much as concedes that he cannot demonstrate reliance when he asserts that he can demonstrate scienter through "the many transparently false statements and material omissions which ... fooled neither the plaintiff nor many other private shareholders." Consolidated Opp'n at 50. More fundamentally, Howe made no investment decision that was influenced by any of the statements to which he refers: the share redemption was mandatory. Thus there is no reliance because the plaintiff could not have relied on any of the statements in making an investment decision, and there is no causation because there is no transaction in which he "en-

gaged" as a result of the statements. Therefore, I dismiss count 2 as to all remaining defendants.

## C. Count 3: Common Law Fraud and Breach of Fiduciary Duty

The plaintiff also alleges that the BIS defendants committed common law fraud and breaches of fiduciary duty. The parties have assumed that Massachusetts law applies to the plaintiff's common law claims. I accept this assumption, with the gravest doubt, given that the BIS is a creature of an international treaty, two of the other defendants are officials of instrumentalities of the federal government, and the act which the plaintiff claims to have caused him injury (the mandatory redemption of his shares) occurred outside of Massachusetts. Because the plaintiff's claims fail on their merits under Massachusetts law, however, I have neither required nor undertaken further analysis of the choice of law question. *See Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991) (generally when the parties agree as to the applicable law governing a state law claim, the court may forego independent analysis of the question and accept the parties' agreement). After my dismissal at oral argument of count 3 against Morgan Chase, only Greenspan, McDonough and the BIS remain as defendants to this count.

I first consider the claim for common law fraud. To prove fraud under Massachusetts law, "a plaintiff must prove 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" *Sands v. Ridefilm Corp.*, 212 F.3d 657, 663 (1st Cir.2000) (quoting *Barrett Assocs., Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867, 868 (1963)); *accord Rood v. Newberg*, 48 Mass.App.Ct. 185, 192, 718 N.E.2d 886, 892 (1999), *review denied*, 431 Mass. 1106, 733 N.E.2d 126 (2000).

Just as Howe could not establish reliance or causation for his Rule 10b–5 claim, so too can he not meet these requirements for a claim of common-law fraud. As described above, the BIS mandatory share redemption did not require the approval of the private shareholders. Therefore, even if I assume that the defendants made false representations of material fact, Howe did not rely upon those representations and "act thereon" to his damage. Moreover, even if Howe is correct that the price the BIS offered to its private shareholders was unfairly low, his remedy is not a claim for fraud.

I next discuss the breach of fiduciary duty claim. The plaintiff asserts that Greenspan, McDonough, and the BIS "breached their fiduciary duty to the plaintiff by issuing new shares in the BIS at less than full net asset value." Compl. ¶ 94. The issuance of new shares to which the plaintiff refers occurred in 1999, when "the BIS issued a total of 12,000 new shares to several new central bank members, including the European Central Bank, at a price of 5020 gold francs per share." *Id.* ¶ 68. With a gold price of $280 per ounce, this price is the equivalent of $13,119 per share, more than the mandatory share redemption price, but less than the J.P. Morgan & Cie net asset value. *Id.* ¶ 70. Though this section of the complaint does not specifically mention the allegedly unfair price in the mandatory share redemption, the plaintiff presumably meant to restate this allegation through his incorporation of the allegations in counts 1 and 2. *See id.* ¶ 92.

To the extent that the plaintiff claims that the BIS itself violated a fiduciary duty to him, he cites no Massachusetts law (and I am unaware of any) to the effect that a

corporation itself owes a fiduciary duty to its shareholders. *Cf. Merola v. Exergen Corp.*, 423 Mass. 461, 463 n. 3, 668 N.E.2d 351, 353 n. 3 (1996) (noting that a claim for breach of fiduciary duty in a close corporation may lie against majority shareholders, but not against the corporation itself). Courts in other jurisdictions have in fact decided contrary to the plaintiff's contention here. *See, e.g., Arnold v. Society for Savings Bancorp, Inc.*, 678 A.2d 533, 539 (Del.1996) (holding that, under Delaware law, a corporation, as opposed to its directors and officers, could not be held liable for breach of the fiduciary duty of disclosure); *Gates v. BEA Associates, Inc.*, No. 88 Civ. 6522, 1990 WL 180137 (S.D.N.Y. Nov.13, 1990) ("Under New York law, a corporation does not have fiduciary duties to its shareholders."). This rule is even more appropriate for an entity with the unusual characteristics of the BIS, such as the lack of voting rights of the private shareholders and the right of the BIS to veto any sale of its shares.

■ Furthermore, causation is an essential element of a breach of fiduciary duty claim. *Meehan v. Shaughnessy*, 404 Mass. 419, 439, 535 N.E.2d 1255, 1266 (1989). The seventeen directors of the BIS voted unanimously to adopt the mandatory share redemption plan. Only two of the directors, Greenspan and McDonough, are defendants in this case. Given the votes of the other directors, the share redemption would have gone forward regardless of Greenspan's and McDonough's votes. Therefore the plaintiff cannot satisfy the causation requirement of his breach of fiduciary duty claim as to these two defendants.

I therefore dismiss count 3 in its entirety.

### D. Count 4: Constitutional Violations

■ The complaint asserts a fourth count, for "constitutional violations," against Greenspan, McDonough, the Secretary of the Treasury, and the BIS. There has been some ambiguity as to the precise nature of the plaintiff's constitutional claims. In his complaint, the plaintiff captions count 4 "Constitutional Violations." Compl. at 37. In this section of the complaint, the only provisions of the Constitution that the plaintiff cites are portions of Article I that deal with congressional control over the currency. *Id.* ¶ 97 (citing U.S. Const. art. I, § 8, cl. 5; and art. I, § 10, cl. 1). Howe concludes this portion of the complaint by alleging that the defendants identified in this count "have conspired in a scheme which is directed, among other things, at taking the plaintiff's six shares of the American issue of the BIS without paying him fair value therefor or granting him due process of law in connection therewith." *Id.* ¶ 100. However, in his Opposition, the plaintiff states that "the plaintiff does not assert a taking claim," Consolidated Opp'n at 21, but instead asserts "claims under the Fifth Amendment for damages and injunctive relief based on interference with his property rights and deprivation of property without due process by federal officials, including Messrs. Summers, Greenspan and McDonough, acting outside their legal or constitutional authority." *Id.* at 22. He claims that neither the Treasury nor the Federal Reserve has authority to influence the price of gold, *id.* at 25–29; that Greenspan and McDonough, by assuming membership on the BIS board, violated "well-established legal and constitutional requirements for U.S. membership in public international organizations," *id.* at 32; and that by suppressing the price of gold, Greenspan, McDonough, and Summers were acting contrary to United States foreign policy, *id.* at 34–35.

■ The plaintiff's claims against the government officers are barred by sover-

eign and qualified immunity. His claim for specific relief is barred by sovereign immunity, because, as outlined above, the claim does not fall under the *Larson* ultra vires exception. However, sovereign immunity does not block *Bivens*-type actions against officers in their individual capacities for damages, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Rivera v. Riley*, 209 F.3d 24, 26 (1st Cir.2000) (*"Bivens* is the case establishing, as a general proposition, that victims of a constitutional violation perpetrated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits.") (quoting *Wright v. Park*, 5 F.3d 586, 589 n. 4 (1st Cir.1993)). Such a claim is unavailable against federal officials sued in their official capacities. *Rivera*, 209 F.3d at 28.

In this case, however, the government officers are protected from a *Bivens*-type suit by their qualified immunity as executive officials. As noted earlier, both the Federal Reserve and the ESF possess statutory authority to trade in gold. 12 U.S.C. § 354; 31 U.S.C. § 5302. As the plaintiff recognizes, Greenspan and McDonough served on the board of the BIS "pursuant to authority received from both the Secretary of the Treasury and the Secretary of State to assist in carrying out the President's foreign policy." Consolidated Opp'n at 24. Therefore, even crediting the plaintiff's allegations, it cannot be said that Greenspan, McDonough, or the Secretary violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727.

█ The plaintiff has also failed to state a claim against the BIS for a violation of the Constitution. There are at least two reasons to dismiss this claim. First, Howe has not developed this argu-

ment in any of his papers in opposition to the motion to dismiss of the BIS. Second, a *Bivens*-type cause of action does not lie against private entities. *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 521–22, 151 L.Ed.2d 456 (2001).

## V. Conclusion

The motion of the United States to be substituted for Greenspan is GRANTED. For the reasons discussed above, the motions to dismiss of the defendants are GRANTED. The clerk shall enter a judgment dismissing this action as to all defendants.

SO ORDERED.